**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

PARALLEL NETWORKS, LLC,

       Plaintiff,

v.

NETFLIX, INC.;
SKYMALL, INC.;
JOHN WILEY & SONS, INC.;
E*TRADE FINANCIAL CORPORATION;
and
THE FINISH LINE, INC.,

       Defendants.

Civil Action No. 2:07-cv-562-DF

**JURY TRIAL DEMANDED**

---

PARALLEL NETWORKS, LLC,

       Plaintiff,

v.

PRICELINE.COM, INC.;
ORBITZ, LLC;
WALGREEN CO.;
OFFICEMAX INC.;
SHUTTERFLY, INC.;
SAKS INC.; and
CLARK WAMBERG, LLC,

       Defendants.

Civil Action No. 2:08-cv-45-DF

**JURY TRIAL DEMANDED**

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. iii

I.     INTRODUCTION ............................................................................................... 1

II.    PROCEDURAL BACKGROUND ...................................................................... 2

    A.     Filing Of The Present Suits ..................................................................... 2

    B.     Reexaminations ....................................................................................... 4

III.   LEGAL STANDARDS ....................................................................................... 4

    A.     General Rules of Claim Construction. ..................................................... 4

    B.     The Definiteness Requirement Under 35 U.S.C. § 112, ¶ 2. ................... 5

IV.    THE PROPER CONSTRUCTION OF THE DISPUTED TERMS ..................... 6

    A.     Terms In Alphabetical Order ................................................................... 6

        1.     "Concurrently Processes" ............................................................ 7

        2.     "Data Dynamically Retrieved" and "Data Retrieved" ................ 9

        3.     "Dispatcher" .............................................................................. 10

        4.     "Dispatching" ............................................................................ 11

        5.     "Dynamic Web Page Generation Request" and "Dynamically Generating" ............................................................................... 16

        6.     "HTTP-Compliant Device" ....................................................... 19

        7.     "Intercepting" ............................................................................ 21

        8.     "Other Requests" ....................................................................... 28

        9.     "Page" and "Transferring" ........................................................ 29

        10.    "Page Server" ............................................................................ 31

        11.    "Releasing" ................................................................................ 34

            a.     The term "releasing" is indefinite ................................. 35

            b.     Defendants' Alternate Construction is the Proper Construction ................................................................... 36

            c.     Plaintiff's Construction is Improper .............................. 37

        12.    "Routing" ................................................................................... 38

        13.    "Web Page" ................................................................................ 40

        14.    "Web Server" ............................................................................. 43

    B.     Indefinite Terms .................................................................................... 45

V.  CONCLUSION ............................................................................................................ 45

## TABLE OF AUTHORITIES

**CASES**

*AK Steel Corp. v. Sollac*,
  344 F.3d 1234 (Fed. Cir. 2003).......................................................................................15

*Amgen, Inc. v. Chugai Pharm. Co.*,
  927 F.2d 1200 (Fed. Cir. 1991)...........................................................................6, 21, 28, 37

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
  359 F.3d 1367 (Fed. Cir. 2004).......................................................................................35

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
  132 F.3d 701 (Fed. Cir. 1997)...........................................................................................5

*Bell Atlantic Network Servs., Inc. v. Covad Commc'n. Group, Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001).......................................................................................41

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006).....................................................................................11, 33

*Bowers v. Baystate Techs., Inc.*,
  320 F.3d 1317 (Fed. Cir. 2003)...........................................................................................5

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
  349 F.3d 1373 (Fed. Cir. 2003).......................................................................................35

*Halliburton Energy Services, Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008).............................................................................6, 21, 27, 35

*Intervet Am., Inc. v. Kee-Vet Lab., Inc.*,
  887 F.2d 1050 (Fed. Cir. 1989)...........................................................................................1

*Liquid Dynamics Corp. v. Vaughn Co.*,
  355 F.3d 1361 (Fed. Cir. 2004).......................................................................................28

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005).......................................................................................16

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
  520 F.3d 1367 (Fed. Cir. 2008).....................................................................................38, 40

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
  357 F.3d 1340 (Fed. Cir. 2004).......................................................................................25

*Nystrom v. Trex Co.*,
  424 F.3d 1136 (Fed. Cir. 2005).......................................................................................29

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)..................................................................... passim

*Phillips* v. *AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)..................................................... passim

*Rambus Inc. v. Infineon Techs. Ag*,
    318 F.3d 1081 (Fed. Cir. 2003).........................................................................33

*Rodime PLC v. Seagate Tech., Inc.*,
    174 F.3d 1294 (Fed. Cir. 1999).....................................................................33, 34

*Salazar v. Procter & Gamble Co.*,
    414 F.3d 1342 (Fed. Cir. 2005) (Bryson, J., dissenting).....................................26

*Spectrum Int'l v. Sterilite Corp.*,
    164 F.3d 1372 (Fed. Cir. 1998).....................................................................5, 27

*United Carbon Co. v. Binney & Smith Co.*,
    317 U.S. 228 (1942).......................................................................................6, 27

*Vitronics Corp. v. Conceptronics, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)...........................................................................14

## STATUTES

35 U.S.C. § 112, ¶ 2 .............................................................................5, 22, 28, 35

## I.    INTRODUCTION

The patents-in-suit, U.S. Patent Nos. 5,894,554 ("'554") and 6,415,335 ("'335"),[1] relate to a system and method for managing dynamic Web page generation requests. Plaintiff and Defendants agree that the claimed invention, at its core, utilizes a "partitioned architecture" and "offloading." *See* Plaintiff's Opening Claim Construction Brief ("Op. Br.") at 2-3. (Dkt. 186).[2] The "partitioned architecture" and "offloading" aspects of the alleged invention are reflected in Defendants' proposed constructions but often contradicted in the constructions offered by Plaintiff.

Plaintiff and Defendants agree that it is improper to import limitations into the claims. *Intervet Am., Inc. v. Kee-Vet Lab., Inc.,* 887 F.2d 1050, 1053 (Fed. Cir. 1989) (cited in Op. Br. at 4). Defendants have proposed straightforward constructions that are consistent with the claim language and do not improperly import non-existent limitations. In contrast, Plaintiff's constructions often do not clarify the claim language and, in at least one instance, improperly graft non-existent limitations onto the claim language. In particular, in an attempt to distinguish clearly invalidating prior art (an attempt that has been rejected by the U.S. Patent and Trademark Office in the re-examination proceedings), Plaintiff's "dispatching" construction is crafted from various examples in the specification, including "informed selection," "maintaining dynamic information," and "more efficiently process the request." Op. Br. at 15. These phrases are completely divorced from the claim language and are a bald attempt to import limitations that do not exist in the claims.

---

[1] The '554 Patent is attached as Ex. A1 and the '335 Patent is attached as Ex. A2. Citations to the specifications will be made the '554 Patent only but are intended to also refer to the '335 Patent.

[2] Unless otherwise specified, citations to the docket for the instant cases will refer to No. 2:07-cv-562.

In other instances, such as Plaintiffs' proposed construction for "intercepting," Plaintiff attempts to rescue an indefinite claim term by recapturing claim scope that it expressly disavowed during prosecution of the patents-in-suit. In sum, Plaintiff's proposed constructions are based on fundamentally erroneous legal premises and a misreading of the claim language. The Court should adopt Defendants' constructions because they are consistent with the claims, rely on clarifying intrinsic evidence when appropriate, and do not improperly import non-existent limitations.

## II.    PROCEDURAL BACKGROUND

### A.    Filing Of The Present Suits

Plaintiff sued defendants Netflix, Inc., Skymall, Inc., John Wiley & Sons, Inc., E*TRADE Financial Corp. and the Finish Line, Inc. on December 28, 2007, No. 2:07-cv-562. Plaintiff sued defendants Priceline.com, Inc., Orbitz LLC, Walgreen Co., OfficeMax, Inc., Shutterfly, Inc., Saks, Inc. and Clark Wamburg, LLC on February 5, 2008, No. 2:08-cv-45. (Defendants from both suits collectively referred to herein as "Defendants."). The cases were consolidated for discovery and claim construction purposes.

This is not the first time the proper construction of the patents has been addressed. Prior to filing these suits, Plaintiff had asserted the patents-in-suit in several lawsuits, two of which resulted in claim construction rulings.[3] In the *epicRealm* case, Judge Craven issued a Report and Recommendation Regarding Claim Construction that Judge Folsom adopted pursuant to an

---

[3] *epicRealm Licensing, LLC v. Autoflex Leasing, Inc.*, et al., No. 5:07-cv-125 (E.D. Tex.) and *epicRealm Licensing, LLC v. Franklin Covey Co., et al.*, No. 5:07-cv-126 (E.D. Tex.). These consolidated cases are referred to herein as "*epicRealm*" and docket numbers correspond to No. 5:07-cv-125.

Order on October 30, 2006.[4]  Judge Folsom also issued an Order on August 7, 2008, addressing some additional claim construction issues.[5]

Next, in a declaratory judgment action brought by Oracle Corporation against Parallel Networks in the District of Delaware, Judge Robinson issued an Order dated December 4, 2008, construing the claims of the '554 and '335 patents and concluding that the sending of a standard acknowledgement or "ACK" message in the TCP/IP network protocol does not satisfy the "releasing" limitation in the claims as a matter of law.[6]  Many of the terms at issue in the *Oracle* suit are also at issue here, including "releasing," "intercepting," and "dispatching."  Based on her claim constructions, Judge Robinson granted Oracle summary judgment of non-infringement.  Parallel Networks has appealed that ruling to the Federal Circuit.  Defendants have moved to stay this case pending the outcome of this appeal as the Federal Circuit is highly likely to make binding constructions of at least some of the terms in dispute here.  (Dkt.183).

Plaintiff's claim that Defendants' proposed constructions have been expressly rejected in prior cases, *see* Op. Br. at 2, is not true.  Defendants' constructions are not the same as have been previously proposed.  Regardless, the purpose of claim construction is to clarify the claim language for the jury.  The prior proposed constructions have been inconsistent and/or have not resolved all ambiguities, as reflected by the different outcomes on whether an ACK message "releases" a web server.  Defendants have also made repeated, rebuffed attempts to reach agreement or narrow the disputes with Plaintiff on the constructions in dispute.[7]

---

[4] *epicRealm*, Dkt. 194 (Aug. 15, 2006) (attached as Ex. C1) and *epicRealm*, Dkt. 260 (Oct. 30, 2006) (attached as Ex. C2).

[5]  *epicRealm*, Dkt. 686 (Aug. 7, 2008) (attached as Ex. C3).

[6] *Oracle Corp. et al. v. Parallel Networks, LLP*, No. 1:06-cv-414 (Dkt. 401) (D. Del. Dec. 4, 2008) (attached as Ex. C7).  This case is referred to herein as "*Oracle*".

[7] *See* Defendants' March 23, 2009 compromise proposal for nine terms and proposal to drop five terms (attached as Ex. B1); Defendants' April 2, 2009 letter confirming Plaintiff's rejection of the compromises in an April 1, 2009,

### B.     Reexaminations

In addition to the prior litigation, the terms of the claims have also been construed in pending re-examination proceedings.  Prior to the filing of the present actions, three requests for *ex parte* reexamination were filed for each of the patents-in-suit with the U.S. Patent and Trademark Office ("USPTO"). The USPTO granted all six reexamination requests and has issued final rejections of all the claims.[8]

During the reexaminations, Plaintiff has taken drastic positions on the meaning of the term "dispatching," in an attempt to avoid clearly invalidating prior art.  For instance, Plaintiff has attempted to insert limitations into the term "dispatching" similar to those in its proposed construction here, but the examiner has repeatedly rejected such constructions.  *See, e.g.*, Ex. D5 at 6 (stating, "There is no checking of dynamic information recited in the claim language of claims 1, 9 and 11 [of the '554 patent]").

## III.     LEGAL STANDARDS

### A.     General Rules of Claim Construction.

When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve the meaning and scope of the patent claims that the plaintiff alleges have been infringed.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

In construing claim terms, "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (quotations omitted).  The person of

---

teleconference without offering alternatives or discussing compromises (attached as Ex. B2).  Further, Defendants seek to streamline this process by substantially adopting the Court's prior construction for the term "releasing."

[8] On April 30, 2009, the USPTO rejected Plaintiffs request for reconsideration of the final rejections.  The re-examinations will be terminated on June 30, 2009, unless Plaintiff appeals.

ordinary skill in the art does not read the claim term in isolation, but in the context of the entire patent. *Phillips*, 415 F.3d at 1313. Although claims must be interpreted in light of the specification, the court must be careful not to read limitations of particular embodiments of the invention into the claims where they did not already exist. *Id.* at 1324. A court should also consider the prosecution history in construing the claims. *Phillips*, 415 F.3d at 1317. The prosecution history may aid in interpreting the meaning of terms, but in some cases the prosecution history may be more significant if the applicant disclaimed or disavowed any interpretation in order to obtain allowance. *See Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998) ("[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover."). In addition, during reexamination a patentee's statements and amendments may disclaim claim scope. *See, e.g.*, *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1333 (Fed. Cir. 2003) ("The reexamination history also precludes this court from adopting a broader construction.").

Extrinsic evidence may help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean. *Phillips*, 415 F.3d at 1319. Still, any extrinsic evidence that is inconsistent with unambiguous intrinsic evidence should be accorded no weight. *Id.*; *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997).

Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316.

### B.    The Definiteness Requirement Under 35 U.S.C. § 112, ¶ 2.

Every patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35

U.S.C. § 112, ¶ 2.  The definiteness requirement ensures that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude. *See Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).  The indefiniteness inquiry requires a court to determine objectively whether a person of ordinary skill in the art would understand the scope of the challenged claim when it is read in light of the specification. *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1217 (Fed. Cir. 1991).[9]  A claim is indefinite when a defendant shows by clear and convincing evidence that one of ordinary skill in the art could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as his knowledge of the relevant field of art. *Halliburton*, 514 F.3d at 1249-50. The burden to particularly point out and distinctly claim the subject matter which the applicant regards as his invention applies with special force at the point of novelty. *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1218 (Fed. Cir. 1991) ("When the meaning of claims is in doubt, especially when, as is the case here, there is close prior art, they are properly declared invalid.").

## IV.    THE PROPER CONSTRUCTION OF THE DISPUTED TERMS

### A.    Terms In Alphabetical Order

The following terms are in dispute and are presented in alphabetical order to explain why Defendants' constructions should be adopted by the Court.

---

[9] According to the Supreme Court, "[t]he statutory requirement of particularity and distinctness in claims is met only when [the claims] clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise." *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942).

1.    "Concurrently Processes"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| processing said request, said processing being performed by said page server while said Web server concurrently processes said other requests | processing a dynamic Web page generation request by said page server while said Web server processes said other requests at the same time, either interleaved or in parallel | processing said request, said processing being performed by said page server for an overlapping period of time while the Web server processes said other requests. |

The phrase "processing said request, said processing being performed by said page server while said Web server concurrently processes said other requests" appears throughout the claims of both the '554 and '335 patents.  The primary dispute is whether "concurrently processes" means handling the requests at the same time, as is evident by the meaning of "concurrently," or can mean "interleaved," as Plaintiff suggests.  Plaintiff correctly states that the parties disagree "whether this processing must be 'at the same time, either interleaved or in parallel,' or 'for an overlapping period of time.'"  Op. Br. at 23.  However, Plaintiff urges this Court to interpret this claim term in a vacuum, without reference to the context of the claim, and without support from the specification.

The patents-in-suit are directed towards relieving the load on the processor of the web server machine by "offloading" the duty of handling web requests so that the web server can handle additional web page requests.  The inefficiency in prior art multi-threaded web servers is explained in the specification:

> "For example, a large Web site may receive thousands of requests or "hits" in a single day. Current Web servers process each of these requests on a single machine, namely the Web server machine. Although these machines may be running "multi-threaded" operating systems that allow transactions to be processed by independent "threads," all the threads are nevertheless on a single machine, sharing a processor. As such, the Web executable thread may hand off a request to a processing thread, but both threads will still have to be handled by the processor on the Web server machine. When numerous requests are being simultaneously processed by multiple threads on a single machine, the Web server can slow down significantly and become highly inefficient. The claimed invention

> addresses this need by utilizing a partitioned architecture to facilitate the creation
> and management of custom Web sites and servers."

'554, 4:37-53. Plaintiff agrees, asserting that "[t]he claimed architecture allows the offloading of

some request processing from the 'Web server' to 'page servers.'" Op. Br. at 3. Plaintiff takes a

step back, however, and attempts to broaden the scope by proposing that the Court insert

"interleaved" into the definition. Plaintiff's broad construction contradicts the intrinsic record

which clearly calls for simultaneous processing by multiple servers:

> "If, for example, Page server 404(2), receives the request, Page server 404(2) will
> process the request. While Page server 404(2) is processing the request, Web
> server executable 201(E) can concurrently process other Web client requests. This
> partitioned architecture thus allows both Page server 404(2) and Web server
> executable 201(E) to <u>simultaneously process different requests, thus increasing
> the efficiency of the Web site</u>."

'554, 6:20-27 (emphasis added). Interleaving requests does nothing to increase website

efficiency over the prior art.

The proper construction of "concurrently processes" should be "said processing being

performed by said page server for an overlapping period of time while the Web server processes

said other requests" as asserted by the Defendants. It would be contrary to the stated goal of

"offloading" requests to page servers to incorporate Plaintiff's "interleaved" concept.

Plaintiff's use of extrinsic evidence contradicts the intrinsic record to improperly broaden

the claim scope. This court has frequently warned against such use of extrinsic evidence, noting

that extrinsic evidence is "less significant than the intrinsic record in determining 'the legally

operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317. Extrinsic evidence is

typically not created for the purpose of explaining the meaning of claim terms, may not reflect

the understanding of a person having ordinary skill in the art, and may suffer from a litigation-

inspired bias that is not present in the intrinsic record. *See id.* at 1318.

Plaintiff's proposal to insert the term "interleaving" into the construction would mean that a web server could offload web page requests to a page server **running on the same processor**.  The applicants, however, specifically disclaimed any interleaving of the processing by the web server and the page server in the specification.  Therefore, the court should adopt the Defendants construction for "concurrently processing."

### 2.    "Data Dynamically Retrieved" and "Data Retrieved"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| data dynamically retrieved | data retrieved in response to a request | data retrieved in response to a request, rather than data written to a Web page prior to said request |
| data retrieved | data that has been obtained | data retrieved in response to a request. |

The two claim terms at issue use different phrasing: one term uses "dynamically" and one does not.  "Dynamically" means that the retrieval is occurring at the time it is needed rather than at a predetermined or fixed time.  Thus, the distinction between the two claim terms is that while "data retrieved" is data retrieved in response to a request, no matter whether it was written in response to the current or a prior request, "data dynamically retrieved" can mean only that data retrieved during the processing of a request that was not already written and contained in the returned Web page prior to the generation of the browser's request or that was not earlier retrieved and cached prior to the current request.

Plaintiff's construction ignores the obvious difference between the two claim terms, and ignores the temporal nature of dynamic retrieval in the first claim.  The second interpretation of the claim term "data retrieved" likewise uses the passive voice to interpose a temporal element in this claim where time is no longer a factor in either the use or presentation of the data.  Defendants' construction, on the other hand, is consistent with the discussion in the specification

and offers necessary clarification of the differences between the claims.  '554, Figs. 3, 5; 1:39-56; 2:20-34; 5:38-48; 6:27-48; 6:60-65.

### 3.     "Dispatcher"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| dispatcher | software, or a machine having software, that performs the function of dispatching | a machine having software, or software independent of the Web server, that performs the function of "dispatching." |

The parties' only dispute on "dispatcher" is whether it must be something different from the separately claimed web server.  Because the claims require that the web server route a request to the dispatcher, they cannot be the same thing without rendering the language meaningless.

Although in one example in the specification the dispatcher exists on a machine separate from the Web server, *see* '554, 5:8-12, the specification discloses another embodiment of the invention in which the dispatcher and Web server are software applications that co-exist on the same machine. '554, 5:21-22.  When both Web server and dispatcher run on the same machine, the dispatcher must be independent and separate from the Web server because claims of the patents require the Web server to "route" requests to the dispatcher.  *See, e.g.*, '554 claim 1; '335 claim 2.  If these components were not independent, any overlap of function between the Web server and dispatcher would consign the role of dispatcher to merely an extension of the Web server.  This would eliminate the express routing step in the claims.

Plaintiff argues incorrectly that because the specification explains that the interceptor may take the form of an extension of the Web server, the dispatcher may also be an extension of the Web server.  *See* Op. Br. at 9-10.  It is clear from the specification that interceptor and the dispatcher are not comparable elements of the claims.  Unlike the step of routing the request from the Web server to a dispatcher, routing the request from the Web server to an interceptor is

not a limitation in the claims. '554, 5:20-25. Furthermore, nowhere does the specification state that the dispatcher may act as an extension to the Web server, as it expressly does for the interceptor.

The dispatcher must be independent of the Web server because any other construction would render the limitation of routing from the Web server to the dispatcher superfluous and eliminate a meaningful distinction between two separate elements of the claims. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950-51 (Fed. Cir. 2006) ("[A]llowing the patentee to argue that . . . characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous."). In *epicRealm*, this Court recognized that a Web server and page server cannot overlap or the "routing" limitation would be rendered meaningless. *See* Ex. C3 at 6-7 (concluding that "page server" and "Web server" cannot overlap because the "routing" limitation would not be met). This reasoning also holds true for the dispatcher, and Defendants' construction unambiguously embraces the meaningful distinction between the dispatcher and Web server required by the claims.

### 4.    "Dispatching"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| dispatching | examining a request to make an informed selection of which page server should process the request; based on dynamic information maintained about page servers, the dynamic information indicating which page server can more efficiently process the request; and sending the request to the selected page server. | sending a dynamic Web page generation request to one selected page server out of multiple page servers. |

The asserted claims recite that after dynamic web page requests are routed from the Web server to a dispatcher, the act of "dispatching said request to said page server" occurs. Defendants' proposed construction for "dispatching" should be adopted because it focuses on the

usage of the term in the claims, is consistent with the stated purpose of the alleged invention and the ordinary meaning of the term, and does not improperly import limitations (examples) from the specification and the preferred embodiment.[10]   Plaintiff's proposed construction should be rejected because it violates several fundamental principles of claim construction.   Specifically, Plaintiff's construction improperly imports limitations from the specification and the preferred embodiment into the claims and violates the doctrine of claim differentiation.

> a.      *Plaintiff's Proposed Construction Improperly Seeks To Import Limitations From The Preferred Embodiment Of The Specification And Should Be Rejected.*

Plaintiff's construction impermissibly reads several examples from the preferred embodiment into the claims and should not be adopted.  *See Phillips*, 415 F.3d at 1324 (warning courts not to "limit[] the scope of the claims to the embodiments disclosed in the specification").  These extra limitations include: "more efficiently process the request," "examining a request to make an informed selection," and "based on dynamic information maintained about page servers."  Op. Br. at 15.   These are examples, not proper limitations.[11]   *See id.* at 16 (where Plaintiff openly refers to these as "examples of techniques the dispatcher can use" and "just examples").   Most importantly, Plaintiff concedes that the "<u>claim language naturally does not require that these particular illustrative [dispatching] techniques be used, since they are just examples.</u>"  Op. Br. at 16.   Plaintiff's admission alone is dispositive that Plaintiff's proposed construction for "dispatching" should be rejected.

---

[10] Dictionary definitions of "dispatching" are in accord with Defendants' construction.  Ex. F1 ("To relegate to specific destination or send on specific business.").   This comports with testimony of named inventor Ronald Howell in *epicRealm. See* Ex. C10 at 44-45 ("Q: Do you have any understanding what it means to dispatch a request to a [page server?]  A: It just means to send the request over to it.").

[11] The specification expressly acknowledges that its examples do not limit the claims: "Although this invention has been shown in relation to a particular preferred embodiment, it should not be considered so limited.  Rather the present invention is limited only by the scope of the appended claims."  '554, 8:58-61.

Plaintiff does not dispute that a dispatcher performs "dispatching" by sending a request from the Web server to a selected one of multiple page servers, consistent with the specification. *See, e.g.*, '554, 5:38-40 ("Dispatcher . . . dispatches the request to one of a number of Page servers 404 (1)-(n)"). How the dispatcher comes to arrive at the selection of the page server, however, is not a limitation in the claims of the patents. Further, Plaintiff's proposed construction fails to explain what is meant by "more efficiently," "informed selection," and "dynamic information"; all terms that would require additional construction and/or render Plaintiff's construction indefinite.

First, Plaintiff's attempt to add the limitation "more efficiently process the request" from the preferred embodiment is improper. There is nothing in the claim language that even remotely suggests that the dispatcher must select the more efficient page server. Plaintiff incorrectly leaps to the conclusion that the stated purpose of the patents is to improve page server efficiency, and therefore page servers "more efficiently" processing a request must be a limitation in the claims. The stated purpose of the alleged invention, however, is ***not*** to choose ***page servers*** that efficiently process requests, but rather to make ***Web servers*** more efficient. '554, 2:4-7 ("current Web server architecture" that "does not allow the Web server to efficiently . . . process Web client requests"). The improvement over the prior art, according to the specification, is the partitioning of dynamic Web page request processing, which allows the off-loading of requests from the Web server to one of multiple page servers. *See* '554, 4:38-53 (criticizing the prior art, which processes each request on the Web server machine).

Second, Plaintiff's suggestion that the Court should construe "dispatching" to include the additional limitation "examining a request to make an informed selection" should be rejected. The claims do not require that the dispatcher "examine" a dynamic Web page generation request

to make an informed selection.  The words "informed selection" do not even appear in the specification.  It is unclear what purpose examining a request even serves in Plaintiff's proposed construction, since, according to Plaintiff, "dispatching" would be based on dynamic information maintained about page servers, not the request.  Indeed, the example disclosed in the specification does not examine the request at all, but examines multiple page servers and their available resources instead.  '554, 8:21-25 ("Dispatcher **402** can examine the load on each Page server and route new requests according to each Page server's available resources").  Unlike Plaintiff's proposed construction, Defendants' construction does not exclude this embodiment because it only requires sending the request to the selected page server.  *See Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (finding that a claim interpretation that excludes a preferred embodiment is "rarely, if ever, correct").

Finally, Plaintiff's construction wrongly requires the selection to be based on "dynamic information" maintained about the page servers.  The claims do not require the selection of one of the multiple page servers be based on "dynamic information."  In fact, the claims do not require that selection be based any information at all.  Plaintiff argues that without some kind of information the dispatcher cannot select an "appropriate" page server.  The intrinsic record, however, does not require that a page server selection ever be an appropriate one.  Defendants' construction is consistent with the stated purpose of the patent: making the Web server more efficient by off-loading dynamic Web page requests.  The dispatcher can achieve that purpose by selecting ***any*** of the page servers and sending the request to that page server for processing.  Efficiency of the Web site may be further enhanced by selecting a page server that is more appropriate than others, but the claims clearly do not require as much.

> **b.**     *The Doctrine Of Claim Differentiation Precludes Plaintiff's Proposed Construction For The Term "Dispatching.*

The doctrine of claim differentiation also demonstrates that Plaintiff's proposed construction must be rejected. *See AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1242 (Fed. Cir. 2003) (holding that under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend.). Plaintiff's proposed construction seeks to limit the basis for selection to dynamic information only. Plaintiff thus seeks to import into the claims the limitations found solely in the narrower claim 29 of the '335 patent. Unlike all the other claims with a dispatching step, claim 29 already includes the additional limitations sought by Plaintiff:

> 29. A computer-implemented method comprising the steps of: . . .
>
> <u>maintaining dynamic information</u> regarding data sources a given page server may access;
>
> <u>dispatching</u> said request to an <u>appropriate</u> page server <u>based on said request and based on said dynamic information</u> . . . .

'339 claim 29 (emphasis added). Moreover, during reexamination Plaintiff added several new claims that depend on the asserted claims and amended several claims upon which the asserted claims depend. Each of these new claims attempts to further narrow the "dispatching" step by adding the same unsupported limitations Plaintiff seeks to import with its proposed construction. The new dependent claims highlight the broadness of "dispatching" in the asserted claims by introducing limitations such as: "examining a load on said page server" ('554, new Claim 24), "according to said page server's available resources" ('554, new Claim 25), "least busy" ('554, new Claim 26), "capable of servicing . . . based on the examination" ('554, new Claim 28),

"examines information regarding the relative busyness . . . based on the examination" ('554, new Claim 29), and "operational . . . based on examination" ('554, new Claim 30).[12]  Ex. D6 at 6-7.

The clear intent of the patentee to define the term dispatching, by itself, broadly, is demonstrated by patentee's use of the term separately from its use with the other limitations included in Claim 29 and the new claims added during reexamination that Plaintiff seeks to import with its proposed construction.  *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

Plaintiff's proposed construction for dispatching is an obvious attempt to read in unnecessary limitations from the specific examples of the preferred embodiment disclosed in the specification.  Other than pointing out these "examples," Plaintiff provides no justification for its proposed construction and ignores the most important intrinsic evidence: the claims of the patents-in-suit.  *See Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction").  Defendants' construction, on the other hand, allows the page server to be selected without importing unclaimed limitations from the specification.

### 5.    "Dynamic Web Page Generation Request" and "Dynamically Generating"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| dynamic Web page generation request | a request to create a dynamic Web page | a message sent from Web browser to create a Web page containing information retrieved from one or more data sources, rather than retrieving a static or pre-existing Web page |
| dynamically generating | creating in response to a request | creating in response to a request, rather than retrieving a static or pre-existing Web page |

---

[12] *See also* new Claims 213-215, 217-219 of the '554 Patent, Ex. D6 at 44-45.

The difference between the parties' constructions on these terms is that Defendants' constructions clarify the meaning of "dynamic." In particular, Defendants' definitions makes clear that "dynamically generating" a Web page means something other than fetching a pre-existing page – it means building it at the time of and in response to the specific request.

The parties agree that "dynamically generating" includes the concept of "creating in response to a request." Defendants' proposed construction further clarifies that a "dynamic" Web page is not a static or pre-existing page (*e.g.*, a website homepage). In each of the asserted claims, the term "dynamically generating" appears in the context of generating a Web page that includes "data dynamically retrieved" or "data retrieved" "from one or more data sources," as opposed to retrieving a static Web page or a pre-existing Web page. '554, 9:9-11, 10:15-18.

Figure 5, and its accompanying text, explains that "dynamically generating" a Web page leads to the creation of a "newly generated HTML document" or a "new HTML document." '554, fig. 5 (blocks 520, 522); 8:43-49. Thus, "dynamically generating" incorporates both the concept of "creating in response to a request," and the concept of not "retrieving a static or pre-existing Web page." The Court should thus properly interpret "dynamically generating" as "creating in response to a request, rather than retrieving a static or pre-existing Web page."

The proper definition of "dynamic Web page generation request" follows from the proper construction of the term "dynamically generating" discussed above, the proper definition of the term "request" (construed separately), and the plain language of the claims. As agreed by the parties, a "request" is "a message that asks for a Web page," while "dynamically generating" means "creating in response to a request, rather than retrieving a static or pre-existing Web page." Additionally, each of the asserted claims states that the Web page that is created includes "data retrieved" or "data dynamically retrieved" "from one or more data sources." '554, 9:9-11,

10:15-18.  Thus, the Court should properly construe "dynamic Web page generation request" as "a message sent from a Web browser to create a Web page containing information retrieved from one or more data sources, rather than retrieving a static or pre-existing Web page."  *See Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms.").

Plaintiff's argument that including the clause "from one or more data sources" in the definition of "dynamic Web page generation request" makes other claim language superfluous is misplaced.  The claims, indeed the patents as a whole, address the management of "dynamic Web page generation requests."  *See, e.g.*, '554, Abstract ("[T]he present invention claims a computer-implemented method for managing a dynamic Web page generation request to a Web server"); Op. Br. at 2 ("[t]he patent in suit relate to managing dynamic web page generation request").  As part of this management, the claims disclose a step of generating Web pages with data retrieved or dynamically retrieved from "one or more data sources."  Thus, defining the term "dynamic Web page generation request" to include the phrase "information retrieved from one or more data sources," accurately reflects the alleged invention claimed in the patents-in-suit.  *See* '554, Abstract.

Plaintiff's proposed construction for this term – "a request to create a dynamic Web page" – sheds little light on the meaning of the term and does not clarify whether the term applies to static or pre-existing pages.  But, in conjunction with "said Web page including data [dynamically] retrieved from one or more sources," '554, 9:10-11, Plaintiff's proposed construction further supports construing the term "dynamic Web page generation request" as "a message sent from a Web browser to create a Web page containing information retrieved from one or more data sources, rather than retrieving a static or pre-existing Web page."

### 6.     "HTTP-Compliant Device"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| HTTP-compliant device | a device that is compliant with the communication protocol known as HyperText Transport Protocol (HTTP) | a device running software that implements the communication protocol known as HTTP. |

Defendants' construction for "HTTP-compliant device" is the proper construction because it is supported by the specification and brings clarity to the term. The sole difference between the parties' constructions is "running software that implements" (Defendants) versus "compliant with" (Plaintiff). A claim construction that explains that the "device" is "running software that implements" is more helpful than simply repeating the word "compliant" from the term being construed itself. Since "compliant" has more than one ordinary meaning, a proper claim construction will illuminate this term, rather than just repeating the same phrase in a circular fashion. Where a term has more than one "ordinary" meaning, reliance on such "ordinary" meaning without further construction is improper. *O2 Micro*, 521 F.3d at 1360-61.

Defendants' construction for "HTTP-compliant device" is supported by the specification.[13]   Based on the description in the specification, the *Oracle* court, adopted the identical claim construction proposed by Defendants. Ex. C9_2 at 3.

Plaintiff argues that Defendants' construction is improper because a device can comply with a protocol without running software. Op. Br. at 11. While it is true that in the universe of all "devices," some may comply with a protocol without running software, the specification of the patents-in-suit demonstrates that one of ordinary skill in the art would not consider other devices that comply with HTTP without running software (*e.g.* hard-wired or firmware) as HTTP-compliant. Because the only devices described in the specification as being HTTP

---

[13] "Web client machines running Web browsers can access these Web pages at Web sites via a communications protocol known as HyperText Transport Protocol (HTTP). Web browsers are software interfaces that run on World Wide Web clients to allow access to Web sites via a simple user interface." '554, 1:24-29.

compliant are "software interfaces" '335, 1:27, Defendants' construction is supported by the specification. The specification informs the proper construction of the claims. *Phillips*, 415 F.3d at 1312.

Further, Plaintiff has previously admitted that this important aspect of the patented device requires that "the appropriate software is required to implement the patented technology." Ex. C9 at 31 (citing '544, 3:54-62).

Plaintiff's construction for "HTTP-compliant device" is improper and Plaintiff itself has taken a previously contrary position to its proposed construction.[14] In Plaintiff's presently proposed construction, the term "compliant with" is undefined and raises additional interpretation questions. Using "compliant with" in the construction does not "clarify" or "explain what the patentee covered by the claims, for use in determination of infringement," as required by the Federal Circuit. *United States Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 531 F.3d at 1360-61. "[R]unning software that implements" is the ordinary and customary meaning one of skill in the art would attribute to the term. *Phillips*, 415 F.3d at 1312.[15]

---

[14] *See epicRealm* proposed construction: "[A] device that understands HTTP and whose behavior is affected by an HTTP request." Ex. C1 at 16-18. Judge Craven rejected epicRealm's construction because the phrases "understands HTTP" and "behavior affected by an HTTP request" were ruled as raising "additional interpretation questions." *Id* at 18.

[15] *See* Ex. F4 (Microsoft computer dictionary) ("HTTP Server - n. 1. Server software that uses HTTP to serve up HTML documents and any associated files and scripts when requested by a client, such as a Web browser.").

7.     "Intercepting"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| intercepting | "intercepting said request at said Web server" means "intercepting the handling of a request at a Web server"<br><br>"intercepting said request at said HTTP-compliant device" means "intercepting the handling of a request at said HTTP-compliant device: | This claim term is indefinite. |

The term "intercepting" appears in Claims 1-11 of the '554 Patent and Claims 1-28 of the '335 Patent, which includes all of the asserted claims. Use of the term "intercepting" in Claim 1 of the '554 Patent is representative of its use in all other claims and recites that dynamic web page requests are routed from the web server to a page server, "wherein said routing step further includes the steps of <u>intercepting</u> said [dynamic web page] request at said Web server [HTTP-compliant device]." '554, 9:1-3 (emphasis added).

With no guidance found in the specification as to the meaning of "intercepting," the Court would ordinarily have to attempt to construe the term pursuant to its ordinary meaning. But, Plaintiff disavowed the only ordinary meaning for "intercepting" during prosecution to overcome U.S. Patent No. 5,754,772 ("Leaf") which Plaintiff unambiguously argued did not teach "intercepting." Consequently, one of ordinary skill cannot determine what is covered by this term and, thus, whether he infringes Plaintiff's alleged invention. As referenced in Plaintiff's brief, Defendants attempted to offer an alternative and narrowing construction that takes into account Plaintiff's disavowal of the one and only ordinary meaning for "intercepting." However, because no narrowing construction can properly be adopted to render the claims definite, the term "intercepting" is hopelessly and insolubly ambiguous. *Halliburton*, 514 F.3d at 1249; *see also Amgen,* 927 F.2d at 1218 (Fed. Cir. 1991) (*citing Standard Oil,* 774 F.2d at 453

("When the meaning of claims is in doubt, especially when, as is the case here, there is close prior art, they are properly declared invalid.")).  Therefore, as shown by the clear and convincing evidence provided below and in Defendants' Motion for Summary Judgment of Invalidity, Claims 1-11 of the '554 Patent and Claims 1-28 of the '335 Patent are invalid as indefinite for failure to comply with 35 U.S.C. § 112, ¶ 2.[16]

> a.   The Specification Fails To Define The Term "Intercepting."

Plaintiff asks the Court to construe "intercepting [a request]" as nothing more than "intercepting [the handling of a request]." Op. Br. at 12.  Plaintiff's refusal to propose a construction for "intercepting" is telling and reflects the absence of any discussion in the specification as to the meaning of the term.[17]  Indeed, this Court has previously confirmed that the specification sheds no light on the meaning of "intercepting," stating that "<u>the specification, however, provides little guidance</u>."  Ex. C1 at 25 (emphasis added).

> b.   The Court Must Attempt To Apply The Ordinary Meaning Of "Intercepting."

As the meaning of "intercepting" is neither facially apparent nor defined in the specification, the Court must attempt to apply the ordinary meaning of the term.  *Phillips,* 415 F.3d at 1321.  Plaintiff's suggestion that the Court decline to construe the term "intercepting" is disingenuous and runs afoul of recent Federal Circuit claim construction law.  *See O2 Micro*, 521 F.3d at 1360-61.  According to *O2 Micro*, when there is a dispute as to claim scope and meaning

---

[16] Contemporaneous with this brief and in accordance with the Court's standing Order on Motion Practice (Dkt. 68), Defendants' filed a motion for leave to file a summary judgment motion of invalidity relating to the indefiniteness of the terms "intercepting" and "releasing."

[17] The **only** mention in the specification of "intercepting" (or its derivatives) are: (i) "Instead of Web server executable 201(E) processing the URL request, however, Interceptor 400 <u>intercepts</u> the request and routes it to Dispatcher 402" '554, 4:58-60; (ii) "Dispatcher 402 receives the <u>intercepted</u> request and then dispatches the request to one of a number of Page servers 404(1) -(n)" '554, 5:37-38; (iii) "In processing block 502, the Web server receives the URL request, and an interceptor then <u>intercepts</u> the handling of the request in processing block 504" '554, 8:29-31; and (iv) "Interceptor <u>intercepts</u> handling of request" '554, fig. 5.

of a claim term, the Court must determine the issue as a matter of law rather than leave the issue to jury. *Id.* Here it is incontrovertible that the parties dispute the scope of the term "intercepting." Defendants maintain that "intercepting" is indefinite because the only permissible construction was disavowed and Plaintiff argues that it should not be construed at all. Of course, Plaintiff hopes that if the Court does not provide a construction Plaintiff can argue that "intercepting" means whatever it needs to support its infringement claims. But this is the very tactic – the moving construction target – that *Markman* and its progeny were designed to prevent.

As shown in the following table, the sworn testimony of the alleged inventors of the patents-in-suit and Plaintiff's own expert, and the examiner's statements demonstrate the ordinary meaning of the term "intercepting" to one of ordinary skill in the art is: *Examining a request by reading the associated configuration data* (e.g., *the Multipurpose Internet Mail Extensions (MIME) type or URL path prefix) to determine, based on such examination how the request should be handled:*[18]

| Person | "Intercepting" to One of Ordinary Skill in the Art |
|---|---|
| **Keith Lowery (inventor)** | • "[t]he web server then underlines examines that URL and determines whether effectively--whether its an HTML document or references what is called a CGI application, which is the way dynamic content was done at this time" Ex. C4 at 1:93-94; <br><br> • "We looked at the actual contents of the requests, which included the URL, sometimes included header information as well" Ex. C13 at 110-11; <br><br> • "We talked about them as glue or adapters, or extensions, or, um -- and I think ultimately when we filed the patent, we talked about interception…Um, and there's a function in here called Web URL that contains part of the code for, um, for looking at the contents of the request" Ex. C13 at 270-71. |
| **Ronald Howell (inventor)** | • "The adapter would, as it says here, determine whether the URL is associated with a static HTML file or a dynamic file created from the page manager. If it was a static filed, then the adapter would just return to the web server, because web servers, that's what they did basically was just return static files…And-but if it--if we wanted to do something dynamic, |

---

[18] Plaintiff referred Defendants "to the prosecution histories of the patents in suit for a citation to the relevant art." *See* Pl.'s Answers and Objs. to E*TRADE'S First Set of Interrogs, at Resp. No. 1 (attached as Ex. B3). Thus, Plaintiff considers the named inventors of the '554 and '335 patents of ordinary skill in the art and Plaintiff has previously relied on Mr. Finkel as one of ordinary skill in the art of the alleged invention(s) of the '554 and '335 patents.

| | |
|---|---|
| | then we would <u>recognize the URL</u>, and we would send it on to another piece of the product, I think the dispatcher or something" Ex. C11 at 65-66; |
| | • "They have what we call 'hooks' or 'ways' to get the <u>URL request</u> and take--so you can write a program or a piece of software that will get that <u>URL request</u> and allow you to <u>determine</u> that you don't want to do anything with it and just give it back and let the web server handle it" Ex. C11. at 66; |
| | • "Yeah. I believe it's <u>looking at the actual URL request</u> that comes into the web server and parsing it to see what's in the request" Ex. C11 at 95; |
| | • "We chose to do it this way and <u>look at the string of the URL</u> coming in to <u>determine</u> if it's something we are interested in or not" Ex. C11 at 99. |
| **Andrew Levine (inventor)** | • "[<u>The URL</u>] had something that <u>identified that this was a request</u> that we were interested in" Ex. C12 at 60-61; |
| | • "[B]ut I mean the interceptor itself had the intelligence to know whether or not is this a request that we need to deal with, is this a request that is going to end up being one of our requests…Our requests would be, is this -- is the <u>URL</u> that is being requested by the client, <u>does it contain magic data</u>, right, that we could <u>recognize that says this is a URL</u> for something that we're going to need to process via page server" Ex. C12. at 68-69; |
| | • "would <u>examine any URL that was requested</u>, something that was typed in a browser that said go get this and would look for a specific magic thing, right. Here where it says case cookie, about halfway down page three, that's the designating right there that we have found something and it's something that we really want, right. This is something that we need to deal with. So this is, in essence, interception" Ex. C12 at 320; |
| | • "It's integral in the sense of you have to be able to <u>identify URLs</u> that are of interest to you, because if you don't then you can't go and make requests of your dispatcher or page server" Ex. C12 at 323. |
| **David Finkel (Plaintiff expert)** | • "So since the NetScaler has some pages that it sends out on its own and some pages that are sent out by the Apache servers, there's an <u>intercepting step where it decides</u> whether it's going to process this request locally or whether it's going to send the request onto the Apache servers" Ex. C14 at 5:29. |
| **Examiner** | • U.S. Patent No. 5,754,772 ("Leaf") teaches "intercepting the request at the Web server and routing the request to the page server…(col. 2 lines 30-60 and col. 4 line 10 - col. 5 line 50" Ex. E1 at 3-5; |
| | • "Malcolm teaches the <u>usage of a special program in the server to intercept the request and decide</u> how to fulfill the request (col. 1 lines 62-65 and col. 4 lines 57-63)." Ex. D3 at 3. |

The uncontradicted evidence above confirms there is one acceptable construction for "intercepting." Plaintiff's attempts to read out the term by failing to offer a construction are wrong and inconsistent with positions taken by Plaintiff in prior litigations. Previously, Plaintiff argued that Oracle prior art did not disclose "intercepting," stating: "Oracle 2.0 also does not perform the 'intercepting' limitation of the asserted claims…because the 'Web server' of Oracle 2.0 merely routed a request to a 'page server' <u>without examining it and without making a</u>

determination of whether the 'Web server' or a 'page server' should process the request."[19] Interestingly, these same arguments as to the meaning of "intercepting" that Plaintiff made to overcome prior art have been conveniently shelved by Plaintiff for claims construction purposes. Plaintiff argues that there is only one ordinary meaning of the term "intercepting" and that "its meaning is clear." Op. Br. at 12 n.13. Tellingly, Plaintiff does not disclose to the Court what that meaning is in its proposed construction. Plaintiff's refusal to provide the ordinary meaning of the term "intercepting" is motivated, however by its awareness that it previously disavowed that meaning during prosecution to overcome prior art that disclosed "intercepting."

       c.    *Parallel Networks Unequivocally Disclaimed The Ordinary Meaning Of "Intercepting" During The Prosecution Of The Patents-in-Suit.*

Because the specification offers no assistance in defining the term "intercepting," the Court must look to the prosecution history for guidance. *Phillips*, 415 F.3d at 1303. During prosecution of the '335 Patent, the examiner issued an office action rejecting all claims as unpatentable in view of Leaf, among other references. To overcome the examiner's rejection of all claims as anticipated by Leaf, Plaintiff clearly and unequivocally argued that Leaf did not disclose "intercepting," stating:

> "Leaf does not teach or suggest 'intercepting said request.' Instead, Leaf teaches that the web server routes the request directly to the transaction gateway client. Leaf, col. 4, lines 55-57. Leaf does not teach or suggest 'intercepting said request at said Web server' because merely routing a request from a web server to the transaction gateway does not involve interception."[20]

Ex. D2 at 9-10. Plaintiff confirms this clear and unambiguous disavowal during prosecution. *See* Op. Br. at 13 ("The patentees argued successfully that 'Leaf does not teach or suggest

---

[19] Pl.'s Opp. to Oracle's Summary Judgment of Invalidity at 28, *Oracle*, Dkt. (Aug. 21, 2008) (attached as Ex. C7). *See also* Pl.'s Resp. to Def.'s Mot. for JMOL at 6-7, *epicRealm*, Dkt. 725 (Sept. 3, 2008) ("Friendfinder's Netscalers examine requests and determine whether or not such requests need to be sent to a page server.") (attached as Ex. C5).

[20] Any arguments made during prosecution of patents in the same family related to common subject matter limits the scope of claim terms. *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004).

intercepting said request'."). Accepting Plaintiff's express disavowal of claim scope, the examiner allowed original claims 18 (asserted Claim 2) and 32 (asserted Claim 16) of the '335 Patent, both of which contain the "intercepting" term. Ex. D3 at 5.

The Leaf patent clearly discloses "intercepting." The examiner, who is considered one of ordinary skill in the art as a matter of law,[21] rejected original claims 17-45 as anticipated by Leaf, because Leaf taught "intercepting the request at the Web server and routing the request to the page server . . . (col. 2 lines 30-60 and col. 4 line 10 - col. 5 line 50." Ex. D1 at 3-5. The Leaf patent, much like the '554 and '335 patents, discloses a Web server and database system that generates dynamic Web pages in response to requests from a Web browser. In response to the examiner's rejection, Plaintiff conveniently only cited a small portion of Leaf and left out the most crucial portions of Leaf's disclosure that read right on the "intercepting" term.[22, 23] These missing portions disclose, however, the ordinary meaning of "intercepting." The chart below depicts the disclosure of "intercepting" in Leaf: the Web server examines the URL, MIME, or other associated configuration data of the request and based on that examination, the request is either forwarded to a transaction gateway client (equivalent of a page server in the '554 and '335 patents) or the request is handled by the Web server:

| Ordinary Meaning of "Intercepting" | Leaf |
|---|---|
| examining a request by reading the associated configuration data (e.g., the Multipurpose Internet | • The Web server in Leaf examines a request by reading the associated configuration data. Ex. E1 at 9:42-45 ("URL that contains the request is |

[21] The examiner for the USPTO is presumed to be one of ordinary skill in the art. *See Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1348 (Fed. Cir. 2005) (Bryson, J., dissenting) ("the statement is relevant…because it indicates how a person of ordinary skill in the art-in this instance, the examiner would understand the claim").

[22] Plaintiff argued, incorrectly, during prosecution that Leaf only disclosed "merely routing a request from a web server to the transaction gateway," *see* Ex. D2 at 9-10, and cited a misleading portion of Leaf that states "the request is routed to the Web Server 18, which in turn routes the request to the Transaction Gateway Client." *See* Ex. D2 at 9-10 (citing Leaf, 4:56-57).

[23] Although not directly relevant to claim construction, Defendants believe Plaintiff committed inequitable conduct before the USPTO by making misrepresentations material to patentability concerning the Leaf reference, among other misrepresentations, and intend to address the unenforceability of the patents separately.

| | |
|---|---|
| Mail Extensions (MIME) type or URL path prefix) | read. The processing to be performed for the request is dependent upon the Multipurpose Internet Mail Extension (MIME) type or the path prefix in the URL") |
| to determine, based on such examination how the request should be processed. | • Depending on the associated configuration data included in the URL, the request is **either** forwarded to a transaction gateway client (the equivalent of the Page Server in the '554 and '335 patents) Ex. E1 at 9:54-61 ("<u>The selection Step 410 directs which processing path is followed</u>. For a MIME type of prefix dictating a transaction, as indicated by Block 412, Gateway Link Processing (Fig. 11) is initiated at Step 414. The Gateway Link Processing <u>forwards the request to the Transaction Gateway Client</u>"); |
| | • **or**, the request is handled by the Web server. Ex. E1 at 9:62-65) ("Other MIME types, as indicated by Block 416, include text/HTML, text/plain, image/gif, image/jpeg, and are usually <u>handled by the Web Server's</u> 18 'send file' function or other customized gateway processing as shown by Step 418"). |

As observed above, the specification of the '554 and '335 patents does not define the term "intercepting" and Plaintiff specifically excluded the one and only meaning of "intercepting" from the scope of the claims, thus serving notice that nobody practicing the ordinary meaning of "intercepting" taught in Leaf can infringe the '554 and '335 patents. *See Spectrum Int'l*, 164 F.3d at 1378-79 ("Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover"); *Halliburton*, 514 F.3d at 1252 (holding that evaluation of claim's indefiniteness includes whether the patent expressly or clearly differentiates itself from specific prior art). Consequently, one of ordinary skill in the art is left without any criteria to determine what constitutes "intercepting" and would not understand the bounds of each and every claim containing the term "intercepting," thus thwarting the very purpose of public notice that the statutory definiteness requirement was meant to serve.[24] Defendants attempted to offer an alternative and narrowing construction that takes into account Plaintiff's disavowal of the one and only ordinary meaning for "intercepting."[25] However, no

---

[24] *See United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942) ("[t]he statutory requirement of particularity and distinctness in claims is met only when [the claims] clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise").

[25] *This claim term is indefinite. Alternatively, this term should be construed as:* Examining a request **without** reading the associated configuration data (e.g., the Multipurpose Internet Mail Extensions (MIME) type or URL

narrowing construction can properly be adopted to render the claims definite.  *See Amgen,* 927

F.2d at 1218 (Fed. Cir. 1991).  Therefore, Claims 1-11 of the '554 patent and Claims 1-28 of the

'335 patent are invalid as indefinite under 35 U.S.C. § 112, ¶ 2.

### 8.    "Other Requests"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| other requests | different requests | different new and pre-existing messages that ask for a Web page. |

Defendants ask the Court to construe "other requests" consistent with its ruling in

*epicRealm*.  In that case, the parties agreed that on a construction defining the term as "different

requests" but epicRealm subsequently argued that "other requests" included both new and pre-

existing requests.  Ex. C3 at 9.  This Court agreed, concluding that "'other requests' should

include both new and pre-existing requests."  *Id.* at 10.  Accordingly, Defendants' proposes that

the construction of "other requests" means different new and pre-existing messages that ask for a

Web page.

In contrast, by merely substituting "different" for "other" in the term, Plaintiff's

construction provides no additional clarification and, as evidenced by the subsequent dispute in

*epicRealm*, would only serve to confuse the jury.  *See Liquid Dynamics Corp. v. Vaughn Co.*,

355 F.3d 1361, 1367 (Fed. Cir. 2004) (holding that the construction must be "a fixed,

unambiguous, legally operative meaning" for the claim).  Plaintiff agrees that a "request" is a

"message."[26]

---

path prefix) to determine, based on such examination, whether a page server should generate a dynamic Web page
and, if so, diverting the handling of the request away from the Web server to a page server.

[26] Plaintiff's proposed construction for "request" is "a message that asks for a Web page."  *See* Op. Br. at 26.

### 9. "Page" and "Transferring"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| page | content | Construed the same as "Web page" |
| transferring | sending | Construed the same as "routing" |

The terms "page," as opposed to "Web page," and "transferring," as opposed to "routing," do not appear in the '554 Patent. The terms "page" and "transferring" only appear in claims 15 and 29 of the '335 Patent and their dependent claims. Plaintiff argues that "page" should have a broader meaning than "Web page" and "transferring" should have a broader meaning than "routing." To the contrary, the intrinsic record provides no support for Plaintiff's broad constructions and, when taken as a whole, it is clear that the patentee intended "page" and "transferring" to mean the same as their original counterparts. *See Nystrom v. Trex Co.*, 424 F.3d 1136, 1142-43 (Fed. Cir. 2005) (construing "board" as made of wood despite the term "wood decking board" in another claim). Accordingly, Defendants' construction of "page" gives it the same meaning as "Web page."

The specification contains the term "Web page" exclusively, and nowhere references the term "page" independently. Accordingly, this Court recognized in *epicRealm* that the "specification uniformly refers to pages in the context of Web pages." Ex. C1 at 10. In claims 15 through 29 of the '335 Patent, pages do not differ in their function from Web pages. "Pages" are dynamically generated by a page server in response to requests. This step is exactly the same as all the other claims of the patents in which Web pages are dynamically generated by a page server in response to requests. According to the specification, page servers generate dynamic Web pages, not generic "content" as Plaintiff proposes. '554, 8:39-41 ("The Page server receives the request and produces an HTML document in processing block 514."). Plaintiff

agrees, as it seeks to construe page server as "page-generating software or a machine having page-generating software that generates a dynamic Web page." (emphasis added).

Similarly, the term "transferring" does not exist in the specification and only appears only in claims 15, 16, and 29 of the '335 patent. Other claims have the same structure as these claims, but use "routing" instead of "transferring." *Compare* '335, claims 15, 16 *with* claims 1, 2.

During prosecution of the '335 patent, both the USPTO and the applicant treated the terms "transferring" and "routing" interchangeably. For example, the Examiner, after explaining why original claims 17-30 were anticipated, noted that "[c]laims 31-45 are different variations of claims 17-30, and therefore, are rejected under the same rationale." Ex. D1 at 3-5. In their response, the applicant did not seek to distinguish "transferring" from "routing" or challenge the Examiner's characterization. Instead, after attempting to distinguish the reference the Examiner relied upon, the applicant simply argued that "[i]ndependent Claim 31 is also allowable at least for the reasons discussed above." Ex. D2 at 11. This pattern was repeated in the next office action, *see* Ex. D3 at 5 ("[c]laims 31 and 33-45 are different variations of claims 17-30, and therefore, are rejected under the same rationale"), and the applicants' response to that office action. Ex. D4 at 9 ("[i]ndependent Claims 31 and 45 are patentable for at least the reasons discussed above with association with independent Claim 17"). Thus, the file history of the '335 patent evidences that both the USPTO and the patentees treated "routing" and "transferring" interchangeably.

The intrinsic record does not offer any justification or substantive basis on which to construe the term "page" any differently from "Web page" or "transferring" any differently than routing. Conversely, Defendants' proposed constructions of "page" and "transferring" are more faithful to the intrinsic evidence and Federal Circuit jurisprudence. *See, e.g.*, *Phillips*, 415 F.3d

at 1319-20 (rejecting the approach of giving "greater emphasis to dictionary definitions of claim terms and [assigning] a less prominent role to the specification and the prosecution history"). Accordingly, the Court should construe "page" the same as "Web page" and "transferring" the same as "routing".

### 10.     "Page Server"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| page server | page-generating software or a machine having page-generating software that generates a dynamic Web page | page generating application software, separate from the Web server and separate from the operating system, that communicates directly with a data source to generate a dynamic Web page. |

This Court previously construed "page server" in the *epicRealm* action to mean "page-generating software that generates a dynamic Web page."  Ex. C1 at 14.  The scope of that construction subsequently became fiercely contested by the *epicRealm* parties and the dispute was addressed by this Court in a supplemental claim construction order.  Although this Court agreed with some of the *epicRealm* defendants' arguments and narrowed the scope of page server to exclude certain configurations inconsistent with the claimed invention, the Court did not alter the term's construction.  Seeking clarity, Defendants respectfully request that the Court revisit the construction of "page server" and consider the arguments Defendants set forth below.

Defendants' proposed construction embraces the Court's previous, original construction and additionally construes page server as application software which is separate from the Web server and separate from the operating system and directly connected to the data source.  The specification supports Defendants' proposed construction.  The preferred embodiment is implemented as "a software module" and described as "application software."  '554, 3:55-58 Accordingly, page servers are described in the specification as separate software modules to

which requests can be off-loaded from the Web server machine.  '554, 5:49-51 ("[E]ach Page server 404(1)-(n) resides on a separate machine on the network to distribute the processing of the request.").

Page servers are also directly connected to data sources otherwise they would not be able to generate dynamic Web pages from data with data dynamically retrieved from those data sources.[27]  For example, one embodiment includes an additional feature which selects one page server rather than the others because the request asks for specific data and the selected page server "has access to the requisite data in data source 408."  *See* '554, 5:60-67.  Ultimately, once the data is retrieved the page server generates a dynamic Web page.  Clearly, a page server is "page-generating software that generates a dynamic Web page" as this Court previously construed and as Plaintiff argued in the *Oracle* action.[28]  To leave the construction as-is, however, would permit configurations which are incapable of meeting other limitations in the claims.

The claimed invention routes a Web page request from a Web server to one of several page servers, after which the page server releases the Web server to process other requests.  '554 claim 1.  Clearly, there can be no overlap between the Web server and page server otherwise the routing and releasing steps would be rendered meaningless.  This Court recognized this problem in *epicRealm* when Plaintiff argued that the operating system software can be part of the Web server and part of the page server on the same machine:

> Specifically, the Court is not convinced that Plaintiffs' proposed construction conforms with the partitioned architecture and the different modules that

---

[27] *See* '554, 5:39-42 ("Page server 404 (1) . . . retrieves the data from an appropriate data source"); '554, 5:45-46 ("Page server 404 (1) can retrieve data from more than one data source").

[28] *See* epicRealm's Claim Construction Brief (redacted) at 25, *Oracle*, Dkt. 231 (Aug. 7, 2008) (proposing the same previous construction of this Court: "page-generating software that generates a dynamic Web page") (attached as Ex. C9).

> epicRealm originally stated characterized the specification as a whole.  If the "web server" and the "page server" exist on the same machine and both include an operating system which "is a part of the web server and . . . part of the page server" as Plaintiffs argue, there would be an overlap at the operating system level between the web server and the page server. The Court agrees that this would extinguish a "**meaningful distinction between two separate elements of the claims**" and would be incapable of meeting the "routing" limitation ("routing said from said Web server to a page server").

Ex. C3 6-7 (citations removed).  "[I]n such a situation the Web server would effectively be 'routing' requests from itself to itself."  *Id.* at 7 n.3.  Plaintiff's proposed construction still ignores this distinction and permits such a nonsensical result.  Defendants' construction, on the other hand, is consistent with the partitioned architecture embraced by the patents in which the page server is separate from the Web server and separate from the operating system.  The Court should adopt Defendant's construction because "any other interpretation would render certain language in the claims meaningless."  *Bicon, Inc.*, 441 F.3d at 949-50 (citation omitted).

Plaintiff argues that a proper construction of page server must include the operating system because the claimed invention would not be able to function.  Therefore, Plaintiff contends, this "assumes" the presence of an operating system in the page server.  This argument is inconsistent with fundamental patent law.  "[T]he claims need not recite every component necessary to enable operation of a working device."  *Rambus Inc. v. Infineon Techs. Ag*, 318 F.3d 1081, 1093 (Fed. Cir. 2003); *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1303 (Fed. Cir. 1999).  The Federal Circuit rejected this argument in *Rambus*, which involved a patent for a memory device.  The district court had construed the term "read request" to mean that it "must include address and control information."  *Id.* at 1092.  The Federal Circuit stated that "[a]lthough one of ordinary skill would know that a memory device needs a block size and address and control information to respond, the claims do not state that such information forms a part of the read request."  *Id.* at 1093.  Thus, "[e]ven though the memory device needs this

information," it need not be part of the claim.  *Id.*  In this case, the claims do not state that the operating system is part of the page server.  Even if an operating system were needed for a working device, it is not part of the claim and should be excluded from the construction of page server to avoid rendering claim language meaningless.

      **11.**     **"Releasing"**

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| releasing | freeing the Web server to process new or pre-existing requests, by, at least, freeing processing resources of the Web server | This claim term is indefinite. Alternatively, this term should be construed as: after the request is received by a page server, said page server performing an act (separate from merely receiving or processing the request) to free the Web server to process other requests. |

The term "releasing" appears within the larger claim limitation "said page server receiving said request and releasing said Web server to process other requests."  Courts that have construed this term have construed it within the context of the larger limitation.  *See, e.g.*, Ex. C1 at 29 (interpreting in *epicRealm* the larger claim term as "said page server receiving said request and said page server performing an act (separate from merely receiving the request) to free the Web server to process other requests"); Ex. C9_2 at 1-2 (interpreting in *Oracle* the larger claim term as "freeing the Web server to process other requests").  These different interpretations of the term "releasing," the varied and ever-changing construction of the term proposed by Plaintiff, and the lack of any disclosure relating to "releasing" in the written description support Defendants' argument that this term is indefinite.[29]  In the alternative, the Court should construe this term as "[a]fter the request is received by a page server, said page server performing an act

---

[29] Contemporaneous with this brief, Defendants filed a motion for leave to file a summary judgment motion of invalidity relating to the indefiniteness of the terms "intercepting" and "releasing."

(separate from merely receiving or processing the request) to free the Web server to process other requests."

> a.    The term "releasing" is indefinite

The term "releasing" is indefinite because, in light of the intrinsic evidence, one of ordinary skill in the art would not be able to determine the metes and bounds of the "releasing" term, and thus would not be able to determine whether he or she infringes the patents. *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004); *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003).

Aside from the claims, the term "releasing" only appears in the patents' title, summary and abstract. The patents do not, however, include any description, embodiment, methodology, algorithm, or instruction that sheds light on the meaning of this term. Indeed, the significantly different interpretations reached by Judge Craven and Judge Robinson illustrate the intrinsic evidence's lack of guidance as to the meaning of this term.

Further evidence that the term is indefinite is provided by Plaintiff's ever-changing, vague, and unsupported stance as to the meaning of this term. In the earlier action before this Court, Plaintiff proposed that the term "releasing" should be interpreted as "freeing." Op. Br. at 18. Before Judge Robinson, Plaintiff criticized Judge Craven's construction decrying "the flaws in that construction . . . evidenced by its admitted problems and ambiguity." Ex. C8 at 16-17. Before the Federal Circuit, Plaintiff embraced this Court's earlier claim construction and argued that "Parallel Networks is entitled to prove infringement by showing . . . that processing resources are freed at the Web server machine when a request is routed to a page server." Ex. C9_3 at 40-41. Indeed, Plaintiff's newly-minted theory is reflected in its proposed construction in this case. This "moving target" approach to claim construction is exactly what § 112, ¶ 2 protects against. *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir.

<u>**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**</u> – Page 35

2008) ("[t]he primary purpose of the requirement is to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their [respective] rights").

For these reasons, the Court should find that the term "releasing" is indefinite.

> b.    Defendants' Alternate Construction is the Proper Construction

Defendants' proposed alternate construction of "releasing," if not indefinite, is proper because it merely gathers the multiple constructions previously made by this Court in *epicRealm* into a single definition, and is more faithful to the intrinsic evidence of the patents-in-suit.[30]

Defendants' proposed construction adds the phrase "after the request is received by a page server" to the beginning of the initial *epicRealm* construction.  This Court in *epicRealm* initially adopted the magistrate's recommendation that "releasing" mean "said page server receiving said request and said page server performing an act (separate from merely receiving the request) to free the Web server to process other requests."  Ex. C1 at 29.  The Court later clarified that the "releasing" step must take place after the step of "receiving the request" Ex. C3 at 13-14 ("the Court holds that 'releasing' may not be performed prior to the receiving of the request.").  Defendants' proposed construction, thus, reflects the final *epicRealm* construction.

Defendants' proposed construction adds one further clarification.  As Judge Craven noted, "releasing" requires an act "separate from merely receiving the request."  Additionally, during the prosecution of the patent, the patentee clearly defined releasing to be something other than processing:

> "At no time does Rogers teach or suggest 'concurrently' processing other requests or 'releasing said Web server to process other requests' because merely retrieving data from multiple sources does not teach or suggest these elements."

---

[30] Defendants propose such an alternate construction because Plaintiff has not made a disavowal of such construction, unlike "intercepting," where a clear disavowal of the only ordinary meaning of the term was made by Plaintiff leaving no alternate construction available.

Ex. D4 at 9.  Thus, the prosecution history forecloses data retrieval from being a releasing step. "Releasing" must be an act other than processing.  Accordingly, the Court should adopt Defendants' proposed construction and construe "releasing" to mean "after the request is received by a page server, said page server performing an act (separate from merely receiving or processing the request) to free the Web server to process other requests."

<em>c.    Plaintiff's Construction is Improper</em>

Plaintiff argues that "the Court should adopt [the *epicRealm* Court's] modified construction here, <u>except</u> that it should omit the limitation that the page server must perform an act, separately from merely receiving the request, to free the webserver."  Op. Br. at 20 (emphasis added).  In other words, Plaintiff asks the Court to reject the *epicRealm* construction and substitute something far broader.  Plaintiff makes no argument, and provides no support, however, for any such broadening of the construction.

Additionally, Plaintiff's proposed removal of the "separate acts" clause of the construction would permit "receiving" or "processing" to constitute "releasing," contradicting the plain language of the claim and the patentees' express disavowal of claim scope during prosecution.

Furthermore, Plaintiff's proposed construction, when analyzed in its simplest form, is reduced to "freeing…by freeing resources."  Such a construction is unhelpful to the jury, and finds no support in the specification of the '335 and '554 patents.  As discussed above, this latest variant in Plaintiff's ever-changing proposed construction of this term simply reflects an attempt to avoid the outcome in the *Oracle* case.  Also, Plaintiff's use of  "at least…" in the construction introduces an open ended range to the meaning of the term that raises further ambiguity and provides no guidance as to where the line should be drawn between the prior art and the guidelines provided in the patent.  *Amgen*, 927.F.2d at 1218.

Accordingly, the Court should find that "releasing" is indefinite, or in the alternate construe "releasing" to mean "after the request is received by a page server, said page server performing an act (separate from merely receiving or processing the request) to free the Web server to process other requests."

12.     "Routing"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| routing | sending or forwarding data along a path toward a destination | As used in the <u>first sense</u>, this claim term is indefinite.  Alternatively, as used in the first sense, this term should be construed as: sending from one component or machine along a path to one of at least two other components or machines.<br><br>As used in the <u>second sense</u>: sending from one component or machine along a path to another component or machine |

The claims of the patents use the term "routing" in two very different ways.  The two ways in which the term "routing" is used overcome the presumption that a term should be construed consistently throughout the claims of the patents.  *See Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375-77 (Fed. Cir. 2008) (finding the presumption overcome because "the claims' apparent nonsensical reading under a uniform construction of 'condition code' is indicative of the ease of determining the appropriate meaning of each use of the term from its context").

Here, the first use of the term "routing" is with respect to routing a "request from said Web server to a page server."  '554 claim 1, 11; '335 claim 1.  When used in this sense, the "routing step" expressly includes three sub-steps: intercepting, routing, and dispatching.  '554 claim 1, 11; '335 claim 1, 2.  Because the term "intercepting" is indefinite, the term "routing" as used in the first sense is indefinite.

"Routing" as used in the ***first sense*** includes "dispatching." The parties agree that dispatching involves multiple page servers. Op. Br. at 15-17; *see also* '554, 5:37-39 ("Dispatcher **402** receives the interrupted request and then dispatches the request to one of a number of Page servers 404(1)-(n)"). Additionally, the parties agree that "routing" involves sending along a path. Thus, the Court should alternatively construe the term "routing" as used in the first sense as "sending from one component or machine along a path to one of at least two other components or machines."

The ***second sense*** in which the term "routing" is used involves sending "said request from said Web server to a dispatcher." '554 claim 1, 11; '335 claim 2. Because the parties agree that "routing" involves sending along a path, the Court should properly construe "routing" as used in the second sense as "sending from one component or machine along a path to another component or machine."

Plaintiff's argument that the inclusion of the phrase "one component or machine" is an improper attempt by the Defendants to restrict what can be a "page server," "HTTP-compliant device," or "dispatcher" (Op. Br. at 18) is misplaced. First, as discussed above, the patents use the term "routing" in two different senses, and in the first sense, the target has to include two or more machines or components (page servers). Op Br. at 15-17; *see also* '554, 5:37-39. As used in the second sense, the target for the term "routing" need not include two or more machines or components. Patentees' electing to use "routing" (in the second sense) as a sub-step of "routing" (in the first sense), necessitates specifying whether the target includes one of two or more machines or components. Second, as is well known in the art, the term "component" covers

"software."[31]    Thus, including the phrase "component or machine" in the construction of "routing" does not limit the meaning of any other term, but instead properly distinguishes between the two different uses of "routing" in the asserted claims.  For this reason, the Court should adopt Defendants' proposed construction.  *Cf. Microprocessor Enhancement Corp.*, 520 F.3d at 1375-77.

### 13.    "Web Page"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| Web page | web content displayable through a Web browser | A document transmitted over the Internet and displayed by a Web browser. |

Simply put, a Web page is a document that exists on a remote server, called up though a URL (Uniform Resource Locator), by the convention: "http://www.txed.uscourts.gov," (this Court's Web page), or through a numerical convention.  Once a user types either of those addresses in a Web browser or clicks on a hyperlink, the Web server responds to the request with the document on this Court's Web server and sends the document to the user's computer for display.

In contradiction to this commonly understood meaning of a Web page, Plaintiff again improperly attempts to persuade the Court to utilize this Court's prior construction of the term "Web page," despite the differences in Defendants' construction from that of the defendants in *epicRealm*, and, ultimately, the Court's analysis of this term. The key difference lies in the Defendants' proffered construction that requires a Web page be an actual page, where Plaintiff asks for the page itself to be defined as the content on the page.  Certainly, Web pages include

---

[31] *See* Ex. F3 (dictionary defining "component" as "1.  A discrete part of a larger system or structure.  2.  An individual modular software routine that has been compiled and dynamically linked, and is ready to use with other components or programs").

content, but a Web page is always a "page" or document requested in the claims of the patents-in-suit, not merely its "content."

The intrinsic evidence defines the term "Web page" as a document that resides on the Web, which is consistent with its plain and ordinary meaning in the art. '554, 1:15-38; 1:47-56; 3:64-4:32. Plaintiff's proposed construction is contrary to its specification and prior arguments in both *epicRealm* and *Oracle*. In *epicRealm*, Plaintiff argued the term "content" is utilized in the Web page display specification, such as in '554, 1:47-51 and 7:23-26. Ex. C4 at 22. Similarly, in the *Oracle* case, Plaintiff argued in its claims construction brief that the specification uses the "content" in the context of Web page content, citing '554 at 1:41 ("content of the Web page"), 1:49 ("content to be included in Web pages"); and, 1:51-52 ("creating Web pages with dynamic content"). Ex. C8 at 23.

In essence, Plaintiff acknowledges that "content" as used in the specification refers to information included in a Web page and that such content itself does not form the Web page. If a Web page were to be construed as the content itself, then the language utilized in the specification would be redundant, essentially saying "content of the Web content" or "content to be included in Web content" or "creating Web content with dynamic content," which language is nonsensical and not within the intent of the claim. The term "Web page" is used throughout the entire specification in the sense of a document, and thus Defendants' construction is the proper and complete construction. *See, e.g., Bell Atlantic Network Servs., Inc. v. Covad Commc'n. Group, Inc.*, 262 F.3d 1258, 1277 (Fed. Cir. 2001).

Plaintiff further attempts to go beyond the plain and commonly understood meaning of the term "Web page" in arguing against Defendants' inclusion of "transmitted over the Internet" in their proposed construction. Defendants' construction provides the necessary clarification

regarding the proper scope and meaning of the term.  The ordinary and customary definition of a "Web page" as applied to the World Wide Web is "a file stored on a Web server that contains formatted text, graphics and hypertext links to other pages on the Internet.  A Web page is created using HTML codes and is viewed with a browser. The specification supports this definition: "Once created, Web pages reside on the Web, on Web servers or Web sites … A Web browser allows a Web client to request a particular Web page from a Web site by specifying a Uniform Resource Locator (URL) . . . ." '554, 1:14-34.

Given that a Web page is located on the World Wide Web, and the World Wide Web is only accessed via the Internet, it follows that a Web page must be transmitted over the Internet. Plaintiff confuses the issue by asserting that a request for a Web page could take place over an intranet instead of the Internet.  An intranet may use the same HTTP Web server technology, protocols and hypertext links as the public Web; however, it resides on an internal, exclusive local area network and not the World Wide Web, and is thus not a "Web" page, but rather an "intranet" page.  Accordingly, documents on an intranet are not Web pages and are not encompassed by the specification.

Lastly, Plaintiff takes issue with Defendants' proposed inclusion of "displayed by a Web browser" versus Plaintiff's "displayable through a Web browser" language.  While Plaintiff is apparently concerned that in some atypical instances a Web page may not actually be displayed, a Web page can only be viewed with a Web browser, which supports Defendants' proposed construction.  Moreover, the unambiguous language of the specification provides that a Web page is not merely displayable, but is in fact displayed by a Web browser. '554, 8:47-51; Fig. 5 block 524.

14.    "Web Server"

| Claim Language | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| Web server | software, or a machine having software, that receives Web page requests and returns Web pages in response to the requests | software, or a machine having software, that receives Web page requests, generates and returns Web pages in response to certain such requests. |

The Web server itself is a dynamic machine and software that has the capability to draw data, text, graphics, and other content from multiple sources and compile that information into a coherent display for users to view on computer monitors and potentially interact with the display. Some Web pages are simplistic and contain only black text on a white background that does not allow such interaction. Other Web pages are on the far extreme, such as video games like *World of Warcraft*, that move and respond with sounds and voices as a user manipulates a keyboard, mouse, microphone or other input device. Many other Web pages, such as those of Defendants', fall somewhere between those two extremes.

The key part to a Web server, consequently, is generating the Web page and its content that responds to a user's request, whether it be in the form of a home page in response to a URL request, a price quote in response to an inquiry, a sound in response to a click on a certain display, or even video or audio. The Web server is not merely a pass-through router, switch, or load balancer. It must at some point generate web pages (*e.g.*, retrieving static files) that are not intercepted and dispatched to page servers. '554, 4:11-25. Defendants' proposed construction incorporates all actions taken by a Web server and is amply supported by the intrinsic evidence. *See, e.g.*, '554, 8:28-49 ("The Web server then sends a new HTML document to the requesting client in the processing block 522") (emphasis added); *see also*, '554, 1:23-38; 3:64-4:10; 6:20-32.

Plaintiff's proposed construction, by contrast, ignores the key function of a Web server – its ability to generate Web pages in response to requests received from users of the World Wide Web. The common, ordinary understanding of a Web server is that it is a server with software capable of creating a Web page in response to a user request. As a ubiquitous example, the YouTube Web server is able to discern the content initially sought by the user, and then suggest other video content that users may find interesting to watch. It is the function of generating this additional content that distinguishes a Web server from a Web page. By adopting Plaintiff's proposed construction of this claim, the Court would be required to ignore the fundamental technology in the machine and software of a Web server: its ability to generate Web pages. Plaintiff's assertions that a page server can generate a Web page, and so Defendants' construction must be inaccurate are misleading. The fact that a page server can generate a Web page does not preclude a Web server from also being able to generate a Web page. A Web server generates Web pages (static or dynamic) in response to requests, and the page server generates Web pages in response to the dynamic requests which are dispatched to it by the Web server. In accordance with the specification, both Web servers and page servers generate Web pages in response to requests, and thus, Defendants' proposed construction is proper and reflects the use of the term in the specifications and the reality of the actions taken. *See, e.g.*, '554, 6:20-32.

Plaintiff further takes issue with Defendants' proposed construction in that it provides that a Web server only responds to "certain" requests. However, the specification clearly provides that the Web server can send some requests to a page server and then can concurrently process other requests. For example, the specification states:

> If, for example, Page server 404(2), receives the request, Page server 404(2) will process the request. While Page server 404(2) is processing the request, Web server executable 201(E) can concurrently process other Web client requests.

> This partitioned architecture thus allows both Page server 404(2) and Web server executable 201(E) to simultaneously process different requests, thus increasing the efficiency of the Web site.

'554, 6:20-32.  It is this description in the specification that clearly and unambiguously supports Defendants' inclusion of the phrase "certain such requests," and the Court should thus adopt this proposed construction.

### B.    Indefinite Terms

Defendants believe that the terms "intercepting," and "releasing," are indefinite and have prepared a separate Letter Motion for Permission to file a Motion for Summary Judgment that provides clear and convincing evidence that these terms are insolubly ambiguous.

## V.    CONCLUSION

For each of the foregoing reasons, where the Court may determine that a term is not indefinite, the Court should adopt the Defendants' proposed constructions.


Dated:  June 15, 2009                              Respectfully submitted,

                                                   By:   /s/ David L. Newman
                                                   David L. Newman
                                                   Richard D. Harris
                                                   Eric Janson Maiers
                                                   James J. Lukas, Jr.
                                                   Howard Silverman
                                                   Jeffrey Mote
                                                   **GREENBERG TRAURIG, LLP**
                                                   77 West Wacker Drive, Suite 2500
                                                   Chicago, IL 60601
                                                   Telephone:  312-456-1006
                                                   Fax:  312-456-8435

                                                   Earl Glenn Thomas, Jr.
                                                   POTTER MINTON
                                                   110 N. College Street, Suite 500
                                                   Tyler, TX 75702
                                                   Telephone:  903-597-8311
                                                   Fax:  903-593-0846

Attorneys for Defendant
**E*TRADE FINANCIAL CORPORATION**

By:   */s/ Ramsey M. Al-Salam*
Ramsey M. Al-Salam
Kaustuv M. Das
Brendan J. Peters
Elana Matt
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206-359-8000
Fax:  206-359-9000

Douglas Ray McSwane, Jr.
Diane DeVasto
Michael Edwin Jones
**POTTER MINTON**
110 N. College Street, Suite 500
Tyler, TX 75702
Telephone:  903-597-8311
Fax:  903-593-0846

Attorneys for Defendants
**OFFICEMAX INCORPORATED and
WALGREEN CO.**

By:   */s/ Neil J. McNabnay*
Thomas M. Melsheimer
melsheimer@fr.com
Texas Bar No. 13922550
Neil J. McNabnay
njm@fr.com
Texas Bar No. 24002583
Tim K. Brown
tkb@fr.com
Texas Bar No. 24043575
David B. Conrad
Texas Bar No. 24049042
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, TX  75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile)

Attorneys for Defendants and Counterclaim
Plaintiffs
**NETFLIX, INC., ORBITZ, LLC, and
PRICELINE.COM, INC.**


By:   */s/ Sheri R. Hunter*
_____
Laura Lee Prather
Sheri R. Hunter
**SEDGWICK, DETERT, MORAN &
ARNOLD**
919 Congress Avenue, Suite 1250
Austin, TX 78701
Telephone:  512-481-8414
Fax:  512-481-8444

Lance Lee
**YOUNG PICKETT & LEE**
4122 Texas Blvd.
PO Box 1897
Texarkana, TX 75504-1897
Telephone:  903-794-1303
Fax:  903-794-5098

Attorneys for Defendants
**THE FINISH LINE, INC., SKYMALL,
INC. and JOHN WILEY & SONS, INC.**


By:   */s/ Michael J. Zinna*
_____
Samuel Franklin Baxter
**MCKOOL SMITH**
PO Box O
104 East Houston St., Suite 300
Marshall, TX 75670
Telephone:  903-923-9000
Fax:  903-923-9099

Lindsay K. Martin
**MCKOOL SMITH**
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone:  214-978-4081
Fax:  214-978-4044

John W. Olivo, Jr.
John F. Ward
Michael J. Zinna
Robert G. Graham
**WARD & OLIVO**
380 Madison Avenue
New York, NY 10017
Telephone:  212-697-6262
Fax:  212-972-5866

Attorneys for Defendant
**SAKS INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on June 15, 2008.

/s/ *David B. Conrad*
.