**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **PARALLEL NETWORKS, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 2:07-CV-562 DF** |
| | § | |
| **NETFLIX, INC., et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| **PARALLEL NETWORKS, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 2:08-CV-45 DF** |
| | § | |
| **PRICELINE.COM INC., et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**CLAIM CONSTRUCTION ORDER**

Before the Court is Plaintiff's Opening Claim Construction Brief.  Dkt. No. 186.[1]  Also

before the Court are Defendants' Responsive Claim Construction Brief, Plaintiff's Reply Claim

Construction Brief, and Defendants' Sur-Reply Claim Construction Brief.  Dkt. Nos. 191, 201,

and 209, respectively.  The Court held a claim construction hearing on August 13, 2009.  Having

considered the briefing, oral arguments of counsel, and all relevant papers and pleadings, the

Court construes the disputed claim terms as set forth herein.

---

[1] All references to docket entries are as docketed in Civil Action No. 2:07-CV-562 unless otherwise
indicated.

1

TABLE OF CONTENTS

I. BACKGROUND . . . . . . . . . . 3

II. LEGAL PRINCIPLES OF CLAIM CONSTRUCTION . . . . 6

III. DISCUSSION . . . . . . . . . . 6

    1. "Concurrently Processes" . . . . . . 6

    2. "Data Dynamically Retrieved" . . . . . 9

    3. "Data Retrieved" . . . . . . . 12

    4. "Dispatcher" . . . . . . . . 13

    5. "Dispatching" . . . . . . . . 14

    6. "Dynamically Generating" . . . . . . 18

    7. "Dynamic Web Page Generation Request" . . . . 20

    8. "HTTP-Compliant Device" . . . . . . 21

    9. "Intercepting" . . . . . . . . 21

    10. "Page Server" . . . . . . . . 29

    11. "Releasing" . . . . . . . . 32

    12. "Request(s)" and "Other Requests" . . . . . 35

    13. "Routing" . . . . . . . . 36

    14. "Transferring" . . . . . . . . 40

    15. "Web Page" and "Page" . . . . . . 41

    16. "Web Server" . . . . . . . . 45

IV. CONCLUSION . . . . . . . . . 47

## I. BACKGROUND

Plaintiff alleges infringement of United States Patent Nos. 5,894,554 ("the '554 Patent") and 6,415,335 ("the '335 Patent") (collectively, the "patents-in-suit"). The '335 Patent is a divisional of the '554 Patent, and the patents-in-suit share a common specification. The '554 Patent is titled "System for Managing Dynamic Web Page Generation Requests by Intercepting Request at Web Server and Routing to Page Server Thereby Releasing Web Server to Process Other Requests." The '335 Patent is titled "System and Method for Managing Dynamic Web Page Generation Requests." The Abstracts of both the '554 Patent and the '335 Patent state:

> The present invention teaches a method and apparatus for creating and managing custom Web sites. Specifically, one embodiment of the present invention claims a computer-implemented method for managing a dynamic Web page generation request to a Web server, the computer-implemented method comprising the steps of routing the request from the Web server to a page server, the page server receiving the request and releasing the Web server to process other requests, processing the request, the processing being performed by the page server concurrently with the Web server, as the Web server processes the other requests, and dynamically generating a Web page in response to the request, the Web page including data dynamically retrieved from one or more data sources.

The claims at issue for claim construction include Claims 1 and 11 of the '554 Patent and Claims 1, 2, 15, and 16 of the '335 Patent. Claim 1 of the '554 Patent recites:

> 1. A computer-implemented method for managing a dynamic Web page generation request to a Web server, said computer-implemented method comprising the steps of:
>     routing said request from said Web server to a page server, said page server receiving said request and releasing said Web server to process other requests, wherein said routing step further includes the steps of intercepting said request at said Web server, routing said request from said Web server to a dispatcher, and dispatching said request to said page server;
>     processing said request, said processing being performed by said page server while said Web server concurrently processes said other requests; and
>     dynamically generating a Web page in response to said request, said Web page including data dynamically retrieved from one or more data sources.

3

Claim 11 of the '554 Patent recites:

11. A machine readable medium having stored thereon data representing sequences of instructions, which when executed by a computer system, cause said computer system to perform the steps of:
routing a dynamic Web page generation request from a Web server to a page server, said page server receiving said request and releasing said Web server to process other requests wherein said routing step further includes the steps of intercepting said request at said Web server, routing said request from said Web server to a dispatcher, and dispatching said request to said page server;
processing said request, said processing being performed by said page server while said Web server concurrently processes said other requests; and
dynamically generating a Web page, said Web page including data retrieved from one or more data sources.

Claim 1 of the '335 Patent recites:

1. A computer-implemented method for managing a dynamic Web page generation request to a Web server, said computer-implemented method comprising the steps of:
routing a request from a Web server to a page server, said page server receiving said request and releasing said Web server to process other requests wherein said routing step further includes the steps of:
intercepting said request at said Web server and routing said request to said page server;
processing said request, said processing being performed by said page server while said Web server concurrently processes said other requests; and
dynamically generating a Web page in response to said request, said Web page including data dynamically retrieved from one or more data sources.

Claim 2 of the '335 Patent recites:

2. The computer-implemented method in claim 1 wherein said step of routing said request includes the steps of:
routing said request from said Web server to a dispatcher; and
dispatching said request to said page server.

Claim 15 of the '335 Patent recites:

15. A computer-implemented method comprising the steps of:
transferring a request from an HTTP-compliant device to a page server, said page server receiving said request and releasing said HTTP-compliant device to process other requests wherein said transferring step further includes the steps

4

of:

       intercepting said request at said HTTP-compliant device and transferring said request to said page server;

       processing said request, said processing being performed by said page server while said HTTP-compliant device concurrently processes said other requests; and

       dynamically generating a page in response to said request, said page including data dynamically retrieved from one or more data sources.

Claim 16 of the '335 Patent recites:

    16.  The computer-implemented method in claim 15 wherein said step of transferring said request includes the steps of:

       transferring said request from said HTTP-compliant device to a dispatcher; and

       dispatching said request to said page server.

    The parties have submitted the following disputed terms, which the Court has herein grouped and arranged in alphabetical order for convenience: (1) "concurrently processes"; (2) "data dynamically retrieved"; (3) "data retrieved"; (4) "dispatcher"; (5) "dispatching"; (6) "dynamically generating"; (7) "dynamic web page generation request"; (8) "HTTP-compliant device"; (9) "intercepting"; (10) "page server"; (11) "releasing"; (12) "request(s)" and "other requests"; (13) "routing"; (14) "transferring"; (15) "Web page" and "page"; and (16) "Web server."  *See* Dkt. No. 181 at Exs. A and B.

    At the claim construction hearing, the Court provided the parties with preliminary constructions for the terms "dispatching," "intercepting," "page server," "other requests," "routing," and "Web page."  *See* Court's Preliminary Constructions, Dkt. No. 220 at Exhibit.  Of these, the parties agreed to the Court's preliminary construction of "other requests," as discussed herein.  Also, the Court provided the parties an opportunity to present a live technical tutorial (*see* Dkt. No. 207), but the parties elected to submit tutorial presentations on compact disc.

## II.  LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

A determination of patent infringement involves two steps: first, the patent claims are construed, and, second, the claims are compared to the allegedly infringing device.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455 (Fed. Cir. 1998) (en banc).  Claim construction is a legal question for the courts.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).  The legal principles of claim construction were reexamined by the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  The Federal Circuit in *Phillips* expressly reaffirmed the principles of claim construction as set forth in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996), and *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004).

The Court construes the disputed terms in accordance with the doctrines of claim construction that it has outlined here along with those it has enunciated in the past.  *See Pioneer Corp. v. Samsung SDI Co.*, No. 2:07-CV-170, Dkt. No. 94, at 2-8 (E.D. Tex. Mar. 10, 2008).

### III.  DISCUSSION

1.      <u>"Concurrently Processes"</u>

This term appears in Claims 1 and 11 of the '554 Patent.  Plaintiff proposes this term means "processing a dynamic web page generation request by said page server while said web server processes said other requests at the same time, either interleaved or in parallel."  Dkt. No. 181, Ex. A at 5.  Defendants propose this term means "processing said request, said processing being performed by said page server for an overlapping period of time while the Web server processes said other requests."  *Id.*, Ex. B at 11-12.

6

a.  The Parties' Positions

Plaintiff proposes that "during one second[,] multiple processes may each receive many fragments of processing time," and "[s]uch processing would not strictly be 'overlapping,' but would occur 'at the same time,' as that phrase would be understood by a person of ordinary skill in the art."  Dkt. No. 186 at 24.  Plaintiff argues that this Court has previously rejected Defendants' purported argument that processing of other requests occurs "literally at the same time."  *Id.* at 23-24.

Defendants acknowledge that "the parties disagree 'whether this processing must be 'at the same time, either interleaved or in parallel,' or 'for an overlapping period of time.'"  Dkt. No. 191 at 7.  Defendants argue that "the intrinsic record . . . clearly calls for simultaneous processing by multiple servers," and "[i]t would be contrary to the stated goal of 'offloading' requests to page servers to incorporate Plaintiff's 'interleaved' concept."  *Id.* at 8.  Similarly, Defendants argue that Plaintiff's proposal should be rejected because "insert[ing] the term 'interleaving' into the construction would mean that a web server could offload web page requests to a page server *running on the same processor*."  *Id.* at 9.

Plaintiff replies by citing earlier claim construction proceedings in the *epicRealm*[2] litigation in which this Court found "there is not a clear disavowal within the specification of the use of a partitioned software architecture *on a single machine*."  Dkt. No. 201 at 8 (citing 8/15/2006 Report and Recommendation, Ex. C1 at 14, and 10/30/2006 Order, Ex. C2).  Plaintiff

---

[2] Discussion of "*epicRealm*" refers to Civil Action Nos. 5:07-CV-125, 5:07-CV-126, and 5:07-CV-135, for which the Court held a jury trial on August 18-25, 2008.  Plaintiff epicRealm Licensing LP was the predecessor of Plaintiff Parallel Networks LLC.  Civil Action Nos. 5:07-CV-125 and 5:07-CV-126 were originally filed as Civil Action Nos. 2:05-CV-163 and 2:05-CV-356, respectively, before being transferred (pursuant to the plaintiff's unopposed motions to transfer) from the Marshall Division to the Texarkana Division.  *See* Civil Action Nos. 5:07-CV-125, Dkt. No. 379, and Civil Action No. 5:07-CV-126, Dkt. No. 354.

argues that "[t]he specification doesn't call for simultaneous processing by multiple machines; it permits that processing to occur on a single machine, so long as that machine utilizes a partitioned architecture that permits the offloading of processing . . . ." *Id.* at 9.  Plaintiff thus seeks adoption of the "at the same time" language in the Court's previous construction with clarification that this language includes both interleaved and parallel processing. *Id.*

      b.  Discussion

        The Court previously considered "concurrently processes" during the *epicRealm* litigation as part of the phrase "said processing being performed by said page server while said Web server concurrently processes said other requests," which the Court construed to mean "said processing being performed by said page server while said Web server processes said other requests at the same time."  Dkt. No. 186, Ex. C1 at 18-20.  The Court at that time rejected arguments that "concurrently processes" refers to processing "literally at the same time" because the specification uses the word "concurrently" with the word "simultaneously" and teaches that "simultaneous" processing can occur even where Web server and page server operations are executed on the same machine.  *Id.* at 19 (citing '554 Patent at 4:48-51 and 6:21-27).  Moreover, the patent also uses the word "simultaneously" with regard to prior art time-interleaved multi-threading techniques.  '554 Patent at 4:48-51.  Further, because a Web server and a page server can run on a single machine, the term "concurrently processes" can include interleaved or parallel processing.  *See* Dkt. No. 186, Ex. C1 at 12-14; *see also* IEEE Standard Dictionary of Electrical and Electronics Terms (Sixth Edition), Dkt. No. 186 at Ex. D4 ("concurrent (software)" defined as "Pertaining to the occurrence of two or more activities within the same interval of time, achieved either by interleaving the activities or by simultaneous execution."); *Phillips*, 415 F.3d

at 1318 (noting that "dictionaries, and especially technical dictionaries," can be "helpful" evidence for claim interpretation)

The Court therefore adopts Plaintiff's proposal to construe "**concurrently processes**" to mean "**processing a dynamic web page generation request by said page server while said Web server processes said other requests at the same time, either interleaved or in parallel.**"

**2.** "Data Dynamically Retrieved"

This term appears in Claim 1 of the '554 Patent and Claim 1 of the '335 Patent. Plaintiff proposes this term means "data retrieved in response to a request." Dkt. No. 181, Ex. A at 2 and 8. Defendants propose this term means "data retrieved in response to a request, rather than data written to a Web page prior to said request." Dkt. No. 191 at 9.[3]

a. The Parties' Positions

Plaintiff argues that "[t]he Court should construe 'data dynamically retrieved' the same way the parties agreed it should be construed in *epicRealm*." Dkt. No. 186 at 27 (citing Ex. C6 at 2). Defendants argue that "'[d]ynamically' means that the retrieval is occurring at the time it is needed rather than at a predetermined or fixed time." Dkt. No. 191 at 9. Plaintiff replies that Defendants' proposed construction would exclude an embodiment because cached pages can be retrieved. Dkt. No. 201 at 10-11.

---

[3] Defendants had proposed in their pre-hearing statement that the term "data dynamically retrieved" means "[d]ata retrieved during runtime." Dkt. No. 181, Ex. B at 1.

b.  Discussion

As to the claims, Claim 1 of the '554 Patent and Claim 1 of the '335 Patent both recite "dynamically generating a Web page in response to said request, said Web page including data dynamically retrieved from one or more data sources," wherein "said request" refers for antecedent basis to "a dynamic Web page generation request."  The term "data dynamically retrieved" thus refers to retrieval that occurs in response to a dynamic page generation request.

As to the specification, "dynamic content" is introduced in the "Description of Related Art":

> The Common Gateway Interface (CGI) standard was developed to resolve the problem of allowing *dynamic content* to be included in Web pages.  CGI "calls" or procedures enable applications to *generate dynamically created HTML output*, thus creating Web pages with *dynamic content*.  Once created, these CGI applications do not have to be modified in order to retrieve "new" or *dynamic data*.  Instead, when the Web page is invoked, CGI "calls" or procedures are used to *dynamically retrieve the necessary data* and to generate a Web page.

'554 Patent at 1:46-56 (emphasis added).  The specification also discloses that "server 404(2) *dynamically generates* a Web page in response to the Web client request, and the *dynamic* Web page is then either transmitted back to requesting Web client 200 or stored on a machine that is accessible to Web server 201, for later retrieval."  *Id.* at 6:27-32 (emphasis added).  The specification also uses the term "dynamically" in a somewhat broader context:

> One embodiment of the claimed invention allows "plug and play" scalability.  As described above, referring to FIG. 4, Dispatcher 402 maintains information about all the Page servers configured to be serviced by Dispatcher 402.  Any number of Page servers can thus be "plugged" into the configuration illustrated in FIG. 4, and the Page servers will be instantly activated as the information is *dynamically* updated in Dispatcher 402.

'554 Patent at 8:10-17 (emphasis added).  These passages teach that the patents-in-suit use

10

"dynamic" to refer to actions taken in response to something, such as a request.  But Defendants'

proposed addition of "rather than data written to a Web page prior to said request" is potentially

too limiting.  For example, a proper construction of "data dynamically retrieved" should not

exclude situations where data is cached, as disclosed in the specification:

> [A]nother embodiment of the present invention supports the caching of finished
> Web pages, to optimize the performance of the data source being utilized.  This
> "page caching" feature, illustrated in FIG. 4 as Page cache 414, allows the Web
> site administrator to optimize the performance of data sources by caching Web
> pages that are repeatedly accessed.  *Once the Web page is cached, subsequent*
> *requests or "hits" will utilize the cached Web page rather than re-accessing the*
> *data source.*  This can radically improve the performance of the data source.

'554 Patent at 6:66-7:8 (emphasis added).  In such situations, data that has been dynamically

retrieved may be written to a Web page prior to a particular request seeking that data.

Defendants' proposed construction would read out this preferred embodiment and is thus

disfavored.  *Vitronics*, 90 F.3d at 1584; *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d

1379, 1383 (Fed. Cir. 2008) (noting caution "against interpreting a claim term in a way that

excludes disclosed embodiments, when that term has multiple ordinary meanings consistent with

the intrinsic record.") (citation omitted); *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir.

2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed

in the specification.") (citations omitted).  As to the word "retrieved," the specification uses this

word to mean obtained, and the Court here incorporates Plaintiff's proposal as to the term "data

retrieved," discussed below.  *See* '554 Patent at 1:46-56; *see also* Oxford English Dictionary

(Second Edition 1989) (retrieve, v.) ("2. ... d. To obtain again (stored information)").

      The Court therefore construes "**data dynamically retrieved**" to mean "**data obtained in**

**response to a dynamic page generation request.**"

**3.**    <u>"Data Retrieved"</u>

This term appears in Claim 11 of the '554 Patent.  Plaintiff proposes this term means "data that has been obtained."  Dkt. No. 181, Ex. A at 2.  Defendants propose this term means "data retrieved in response to a request."  *Id.*, Ex. B at 1.

<u>a.  The Parties' Positions</u>

Plaintiff submits that "the context of 'data retrieved' does not indicate whether a request prompted the generation and retrieval."  Dkt. No. 186 at 28.  Defendants argue that Plaintiff's construction "interpose[s] a temporal element in this claim where time is no longer a factor in either the use or presentation of data."  Dkt. No. 191 at 9.  Plaintiff replies that "while other claims require specify [*sic*] 'dynamically generating a Web page *in response to said request*,' claim 11 of the '554 merely requires 'dynamically generating a Web page.'"  Dkt. No. 201 at 11.

<u>b.  Discussion</u>

Contrary to Defendants' proposal, neither the claims nor the specification require that "data retrieved" in Claim 11 of the '554 Patent must be "retrieved in response to a request."  To the contrary, the absence of the word "dynamically" in this term suggests that "data retrieved" is a more general term than "data dynamically retrieved."  *See, e.g., Helmsderfer*, 527 F.3d at 1382 ("different claim terms are presumed to have different meanings").  Dynamic concepts are addressed with regard to other disputed terms, such as "data dynamically retrieved" and "dynamically generating."  The Court otherwise construes the term "data retrieved" consistent with its construction of "data dynamically retrieved."  The Court accordingly adopts Plaintiff's proposal to construe the term "**data retrieved**" to mean **"data that has been obtained."**

12

**4.**    "Dispatcher"

This term appears in Claims 1 and 11 of the '554 Patent and Claims 2 and 16 of the '335 Patent.  Plaintiff proposes this term means "software, or a machine having software, that performs the function of dispatching."  Dkt. No. 181, Ex. A at 2 and 8.  Defendants propose this term means "a machine having software, or software independent of the Web server, that performs the function of 'dispatching.'"  *Id.*, Ex. B at 2.

a.  The Parties' Positions

Plaintiff submits that "[t]he parties agree that a 'dispatcher' 'performs the function of dispatching'" and that "[t]he parties also agree that [a dispatcher or a page server] may take the form of just software or, at least in the case of a dispatcher, a machine having such software."  Dkt. No. 186 at 8.  Plaintiff argues that "[j]ust as the interceptor may be 'an independent module,' or simply 'an extension to Web server,' so may the dispatcher, which receives requests from the interceptor, take either form."  *Id.* at 9-10 (citations omitted).

Defendants respond that "[b]ecause the claims require that the web server route a request to the dispatcher, they cannot be the same thing without rendering the language meaningless."  Dkt. No. 191 at 10.  Defendants submit that "[w]hen both Web server and dispatcher run on the same machine, the dispatcher must be independent and separate from the Web server because claims of the patents require the Web server to 'route' requests to the dispatcher."  *Id.*  Defendants also argue that the "interceptor and the dispatcher are not comparable elements of the claims."  *Id.*

Plaintiff replies that Defendants' proposal would introduce "superfluousness" because "[t]he claims already prescribe that the routing occurs from the web server to the dispatcher."

13

Dkt. No. 201 at 12.

    b.  Discussion

      The parties apparently dispute whether or not the dispatcher can be part of the Web server

or part of software that includes the Web server.  The specification discloses that "[i]n one

embodiment of the invention, Dispatcher 402 resides on a different machine than Web server

201," but "Dispatcher 402 can, however, also reside on the same machine as the Web server."

'554 at 5:8-9 and 5:20-21.  The patents-in-suit thus teach that the dispatcher and the Web server

can be on a single machine.  Because the relevant claims recite "routing said request *from* said

Web server *to* a dispatcher" (emphasis added), the claims contemplate that the dispatcher is

distinct from the Web server.  This interpretation is consistent with the "partitioned architecture"

articulated in the specification.  '554 Patent at 4:51-53 and 6:24-27.

      The Court therefore construes "**dispatcher**" to mean **"a machine having software

independent of the Web server, or software independent of the Web server, that performs

the function of 'dispatching.'"**

    **5.**     "Dispatching"

      This term appears in Claims 1 and 11 of the '554 Patent and Claims 2 and 16 of the '335

Patent.  Plaintiff proposes this term means "examining a request to make an informed selection

of which page server should process the request; based on dynamic information maintained about

page servers, the dynamic information indicating which page server can more efficiently process

the request; and sending the request to the selected page server."  Dkt. No. 181, Ex. A at 3 and 8.

Defendants propose this term means "[s]ending a dynamic Web page generation request to one

selected page server out of multiple page servers." Dkt. No. 191 at 11.[4]

    a.  The Parties' Positions

Plaintiff submits "examples" from the specification of "connection caching," "data caching," and "load balancing." Dkt. No. 186 at 15-16 (discussing '554 Patent at 5:51-59, 5:60-65, 6:1-1, and 6:12-16). Plaintiff argues that "the patents make clear that the dispatcher must make an informed selection based on dynamic information about the available page servers," which is "the very mechanism by which the invention achieved the efficiency that distinguished it from the prior art." *Id.* at 17.

Defendants respond that Plaintiff attempts to "improperly import[] limitations from the specification . . . and violates the doctrine of claim differentiation." Dkt. No. 191 at 12. Defendants identify Plaintiff's proposed language of "more efficiently process the request," "examining a request to make an informed selection," and "based on dynamic information" as unsupported by the intrinsic evidence. *Id.* at 13-14. Defendants propose that "[h]ow the dispatcher comes to arrive at the selection of the page server . . . is not a limitation in the claims of the patents." *Id.* at 13. Defendants also argue claim differentiation with regard to Claim 29 of the '335 Patent and claims added or amended during reexamination, which purportedly "already include[] the additional limitations sought by Plaintiff" or "attempt[] to further narrow the 'dispatching' step." *Id.* at 15.

Plaintiff replies that "each embodiment describes a page server examining a request, making an informed selection about which page server should process that request based on

_____

    [4] Defendants had contended in their pre-hearing statement that "[t]his claim term is indefinite." Dkt. No. 181, Ex. B at 2. Defendants have evidently withdrawn that contention.

dynamic information maintained about the page servers, and sending the request to the page server that can more efficiently process it."  Dkt. No. 201 at 12.  Plaintiff submits that "the patentee chose to be 'his own lexicographer'" (quoting *Vitronics*, 90 F.3d 1576) and that Defendants' proposed construction contradicts the consistent usage of "dispatching" in the specification.  *Id.* at 12-13.

    b.  Discussion

    The term "dispatching" appears nowhere in the specification, although the words "dispatches" and "dispatched" do appear, in addition to "Dispatcher 402."  *See* '554 Patent at 5:38-40 and 5:51-53.  The *Vitronics* decision, relied upon by Plaintiff, states that "a patentee may choose to be his own lexicographer . . . *as long as the special definition of the term is clearly stated in the patent specification or file history*."  90 F.3d at 1582.  The specification provides no such clear statement, and Plaintiff identifies no relevant file history, so the Court declines to find that the patentee acted as lexicographer as to the meaning of "dispatching."  Instead, the specification describes operations of the "Dispatcher 402," such as that "Dispatcher 402 receives the intercepted request and then dispatches the request to one of a number of Page servers 404 (1)-(n)."  '554 Patent at 5:38-40.  The specification also articulates purported "advantages in the areas of performance, security, extensibility and scalability" and describes "connection caching," "page caching," and "load balancing."  *Id.* at 6:49-8:25.

    First, the specification does not necessarily require that the dispatcher "examin[e]" a request before sending it to one of multiple page servers.  Instead, "load balancing," for example, can be effected by considering the load on various page servers.  *Id.* at 8:21-25; *see also id.* at 6:12-19.  The Court therefore rejects Plaintiff's proposed "examining" language.

Second, the specification does not specify sending requests in accordance with "which page server can more efficiently process the request," as Plaintiff proposes. As Defendants properly note, the specification discloses an objective of improving efficiency of *Web* servers, not *page* servers, stating: "Current Web server architecture also does not allow the Web server to efficiently manage the Web page and process Web client requests"; and "The claimed invention addresses this need by utilizing a partitioned architecture . . . ." *Id.* at 2:4-7 and 4:51-53. The Court accordingly rejects Plaintiff's proposal in this regard.

Third, regarding Plaintiff's proposal of including "dynamic information maintained about page servers," Defendants properly note that "[t]he dispatcher can achieve [the] purpose [of making the Web server more efficient by off-loading dynamic Web page requests] by selecting *any* of the page servers and sending the request to that page server for processing." Dkt. No. 191 at 19. Defendants' argument has merit because "[t]he claimed invention" is rooted in the "partitioned architecture." '554 Patent at 4:51-53. Nonetheless, the specification consistently discloses that "Dispatcher 402 maintains a variety of information regarding each Page server on the network, and dispatches requests based on this information," and "dispatching" should be construed in light of this consistent disclosure. *Id.* at 5:51-53; *see Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143-46 (Fed. Cir. 2005) (affirming construction of "board" that included only "material made from wood cut from a log" in light of "context . . . maintained throughout the written description"). At a minimum, a person of ordinary skill in the art would understand that the dispatcher must have information about the page servers' existence and identities in order to "dispatch[] the request to one of a number of Page servers . . . ." '554 Patent at 5:38-40. Further, "[f]or example, Dispatcher 402 retains dynamic information regarding the data sources that any

given Page server can access." *Id.* at 5:54-56. But overall, the specification does not necessarily

limit such information to either static or dynamic information, however, so a proper construction

should include both types.

Finally, nothing in the claims or the specification requires "multiple page servers" to

which a request can be dispatched, as Defendants propose. Instead, the "Scalability" portion of

the specification, for example, teaches that "[a]ny number of Page servers can . . . be 'plugged'

into the configuration illustrated in FIG. 4, and the Page servers will be instantly activated as the

information is dynamically updated in Dispatcher 402." '554 Patent at 8:13-17. This use of "any

number of Page servers" indicates that there may be only one page server in some embodiments.

*Id.* Such embodiments would be consistent with "enjoy[ing] the advantage" of "off-loading the

processing of Web requests from the Web server machine." *Id.* at 5:27-28.

The Court therefore construes "**dispatching**" to mean "**sending the request to a selected**

**page server based on information (static or dynamic) maintained about page servers.**"

**6.**     "Dynamically Generating"

This term appears in Claims 1 and 11 of the '554 Patent and Claims 1 and 15 of the '335

Patent. Plaintiff proposes this term means "creating in response to a request." Dkt. No. 181, Ex.

A at 4 and 8. Defendants propose this term means "creating in response to a request, rather than

retrieving a static or pre-existing Web page." Dkt. No. 191 at 16.[5]

a.  The Parties' Positions

Plaintiff proposes construing this term "in accordance with its plain meaning." Dkt. No.

---

[5] Defendants had proposed in their pre-hearing statement that the term "dynamically generating" means "[c]reating during runtime." Dkt. No. 181, Ex. B at 5.

186 at 29.  Plaintiff argues that Defendants proposal "adds a temporal limitation" that "would appear to exclude forms of caching contemplated by and described in the specification."  *Id.*  Defendants respond that its "proposed construction further clarifies that a 'dynamic' Web page is not a static or pre-existing page (*e.g.*, a website homepage)."  Dkt. No. 191 at 17.  Instead, Defendants argue, "[i]n each of the asserted claims, the term 'dynamically generating' appears in the context of generating a Web page that includes 'data dynamically retrieved' or 'data retrieved' 'from one or more data sources,' as opposed to retrieving a static Web page or a pre-existing Web page."  *Id.*  Plaintiff replies that "[t]he specification clearly describes a page caching embodiment" and that excluding "pre-existing" pages would exclude an embodiment described in the specification.  Dkt. No. 201 at 10 (citing *Oatey*, 514 F.3d at 1276).

###### b.  Discussion

Here, as with the term "data dynamically retrieved," discussed above, a proper construction of "dynamically generating" should not exclude situations where data is cached, as disclosed in the specification.  '554 Patent at 6:66-7:8.  For example, "re-accessing the data source" can be avoided "by caching Web pages that are repeatedly accessed."  *Id.* at 7:4-7.  Also, "[t]he Page server receives the request and produces an HTML document in processing block 514.  The Page server then responds to the dispatcher with notification of the name of the *cached* HTML document in processing block 516."  *Id.* at 8:39-43 (emphasis added); *see also id.* at Fig. 5.  Further, dynamic generation occurs in response to a dynamic page generation request.  *See id.* at 2:21-35 and 6:27-31.

The Court therefore construes "**dynamically generating**" to mean "**producing in response to a dynamic page generation request.**"

19

   7.   "Dynamic Web Page Generation Request"

This term appears in Claims 1 and 11 of the '554 Patent and Claim 1 of the '335 Patent.

Plaintiff proposes this term means "a request to create a dynamic web page."  Dkt. No. 181, Ex.

A at 3 and 8.  Defendants propose this term means "a message sent from [a] Web browser to

create a Web page containing information retrieved from one or more data sources, rather than

retrieving a static or pre-existing Web page."  Dkt. No. 191 at 16.[6]

   a.  The Parties' Positions

Plaintiff proposes construing this term "in accordance with its plain meaning."  Dkt. No.

186 at 29.  Plaintiff argues that Defendants' proposal "adds a temporal limitation" that "would

appear to exclude forms of caching contemplated by and described in the specification."  *Id.*

Plaintiff argues that the Court should reject Defendants' proposed language of "from a user's

browser" because "nothing precludes other types of clients."  *Id.*  Plaintiff also argues that a page

can include data from "one or more data sources" but need not be "created . . . from" such data,

as Defendants propose.  *Id.* at 29-30.  Plaintiff further argues as to "one or more data sources"

that "other claim language already contains this limitation" and including it "would render other

claim language superfluous while making the definition of the term itself unnecessarily

cumbersome."  *Id.* at 30.

Defendants respond that the proper construction of this term flows from the proper

construction of "dynamically generating" as "creating in response to a request, rather than

retrieving a static or pre-existing Web page."  Dkt. No. 191 at 17.  Plaintiff replies by reiterating

---

[6] Defendants had proposed in their pre-hearing statement that the term "dynamic web page generation request" means "[a] request sent from a user's browser for a Web page that contains information created during runtime from one or more data sources."  Dkt. No. 181, Ex. B at 3.

its opening arguments. *See* Dkt. No. 201 at 11

    b.  Discussion

    Here, as with the term "data dynamically retrieved" and "dynamically generating,"

discussed above, a proper construction of "dynamic web page generation request" should not

exclude situations where data is cached, as disclosed in the specification. '554 Patent at 6:66-

7:8.  Also, the claims articulate retrieving data "from one or more data sources" (*id.* at 9:9-11 and

10:40-41; '335 Patent at 9:8-10), so including such language in a construction of "dynamic web

page generation request" would be superfluous and confusing.  Further, a "dynamic web page

generation request" is not necessarily from a Web browser because the specification repeatedly

refers to a "Web client" as a source of requests (*see, e.g.,* '554 Patent at 3:65-66, 4:12-13, 4:55-

56, and 6:21-24), in addition to a "Web browser" (*id.* at 4:11-15, 4:26-29, and 8:47-51).  The

Court accordingly rejects Defendants' proposal in these regards.  The Court also construes this

term in light of its construction of "dynamically generating," above.

    The Court construes the term **"dynamic web page generation request"** to mean "**a**

**request to produce a dynamic web page.**"

    **8.**       "HTTP-Compliant Device"

    This term appears in Claim 16 of the '335 Patent.  Since briefing, the parties have agreed

that this term means "**a device that is compliant with the communication protocol known as**

**HyperText Transport Protocol (HTTP)**."  *See* Local Patent Rule 4-5(d) Claim Construction

Chart, noticed at Dkt. No. 219, at 6.

    **9.**       "Intercepting"

    This term appears in Claims 1 and 11 of the '554 Patent and Claims 1 and 15 of the '335

Patent. Plaintiff proposes: "'intercepting said request at said Web server' means 'intercepting the handling of a request at a Web server' and the phrase 'intercepting said request at said HTTP-compliant device' means at least 'intercepting the handling of a request at a said HTTP-compliant device.'" Dkt. No. 181, Ex. A at 4 and 9. Defendants propose that this term is indefinite. Dkt. No. 191 at 21.[7]

### a. The Parties' Positions[8]

Plaintiff argues that "intercepting" should be construed as part of larger phrases, as discussed in claim construction in the *epicRealm* litigation. Dkt. No. 186 at 12 (discussing Ex. C1 at 24). Plaintiff also argues that *O2 Micro* only compels construing a term "when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 12 n.13 (quoting *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008)). Plaintiff further argues that Defendants' proposed construction is not justified by any of the patentees' statements during prosecution regarding the Leaf reference (United States Patent No. 5,754,772,

---

[7] In their pre-hearing statement, Defendants proposed the following construction as an alternative to indefiniteness:

> Alternatively, this term should be construed as: Performing the following steps: a) examining a request without reading configuration data that contains the request (i.e., the Multipurpose Internet Mail Extensions (MIME) type or URL path prefix) in order to activate gateway software, b) determining based on such examination that a page server should generate a dynamic Web page in response to a dynamic Web page generation request, and c) diverting the handling of the dynamic Web page generation request away from the Web server instead of permitting the Web server to generate a dynamic Web page in response to a dynamic Web page generation request.

*Id.*, Ex. B at 7.

[8] The Court has also considered, as to the terms "intercepting" and "releasing," Defendants' Motion and Letter Brief for Permission to File Motion for Summary Judgment of Invalidity on Indefiniteness of All Claims of the '554 and '355 Patents, as well as Plaintiff's response and Defendants reply. Dkt. Nos. 190, 195, and 204, respectively. The Court has further considered Defendants' Motion for a Briefing Schedule on Their Proposed Motion for Summary Judgment of Invalidity on Indefiniteness of All Claims of the '554 and '355 Patents. Dkt. No. 205. The Court dismissed Defendants' motions as premature and duplicative of claim construction proceedings. Dkt. No. 206.

Dkt. No. 186 at Ex. D1).  *Id.* at 13 (discussing 5/23/2001 Resp. to Office Action, Ex. D2).

Defendants respond that the term "intercepting" is indefinite because the specification provides no guidance and because the patentees "disavowed the only ordinary meaning for 'intercepting' during prosecution."  Dkt. No. 191 at 21.  Defendants argue that Plaintiff's proposed constructions provide no construction of the disputed term "intercepting" even though Plaintiff asserts that "its meaning is clear."  *Id.* at 25 (quoting Dkt. No. 186 at 12 n.13). Defendants propose that the "ordinary meaning" of "intercepting" is: "Examining a request by reading the associated configuration data (e.g., the Multipurpose Internet Mail Extensions (MIME) type or URL path prefix) to determine, based on such examination[,] how the request should be handled."  *Id.* at 23.  Defendants cite inventor and expert testimony, as well as patent examiner statements, in support of their proposed ordinary meaning.  *Id.* at 23-24.  Defendants then argue that the patentees disclaimed this ordinary meaning during prosecution by arguing that the Leaf reference does not disclose "intercepting."  *Id.* at 25-28.  Because the only ordinary meaning was disclaimed, Defendants argue, the claims are indefinite.  *Id.* at 25-28.  In particular, Defendants point to a passage in the prosecution history that states: "Leaf does not teach or suggest 'intercepting said request at Web server' because merely routing a request from a web server to the transaction gateway does not involve interception."  *Id.* at 3 (citing Ex. D2 at 9-10).

Plaintiff replies that no disavowal occurred during prosecution and that Defendants' proposed "ordinary meaning" amounts to a "convoluted, technical definition."  Dkt. No. 201 at 2. Plaintiff argues that Defendants improperly rely on inventor testimony for an "ordinary meaning" that has no support in the claims or the rest of the specification.  *Id.*  Plaintiff cites earlier claim construction of "intercepting" that found that the prosecution history "merely suggests that

directly routing a request from a web server to a transaction gateway is not intercepting." *Id.* at 3 (quoting Dkt. No. 186, Ex. C1 at 22). Plaintiff also argues that *O2 Micro* does not require the Court to construe "intercepting" differently than in *epicRealm* because Defendants only contend that the term is indefinite. *Id.* at 4 (discussing *O2 Micro*, 521 F.3d 1351).

In sur-reply, Defendants argue that, under *O2 Micro*, the Court must resolve the meaning of "intercepting" because Defendants propose an ordinary meaning while Plaintiff proposes no construction for the term "intercepting." Dkt. No. 209 at 2 and 6. Defendants reiterate and expand upon their discussion of inventor testimony, expert testimony, and the prosecution history. *Id.* at 3-6. Defendants also argue that Plaintiff's expert submitted in the Oracle Action, (Civil Action No. 06-cv-414 (D. Del.)), that Defendants' proposed "ordinary meaning" is correct. *Id.* at 3 (discussing Finkel Rebuttal Report, Dkt. No. 209, Ex. C15 at ¶¶ 148, 150).

At the claim construction hearing, the Court provided its preliminary construction of "intercepting" to mean "interrupting the handling of" and inquired whether "intercepting" should include some element of examining or determining. Dkt. No. 220 at Exhibit. Plaintiff submitted that it would be agreeable to construing "intercepting" to mean "diverting or interrupting the handling of."

b. Discussion

In *epicRealm*, the Court considered the term "intercepting" but construed the larger terms "intercepting said request at said Web server" and "intercepting said request at said HTTP-compliant device." Dkt. No. 186, Ex. C1 at 24. At that time, the Court was "not convinced that the term 'intercepting' needs construction itself or that the constructions proposed by the parties

24

add any needed clarity." *Id.*[9]  The parties now dispute whether the term "intercepting" is itself indefinite, so the Court must determine whether or not that term is amenable to construction. *See, e.g., Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-1250 (Fed. Cir. 2008).

Defendants propose finding indefiniteness based on reading the prosecution history in light of their proposed ordinary meaning of "intercepting," which Defendants argue is the "only ordinary meaning."  Dkt. No. 191 at 21.  The Court has previously found that the prosecution history "merely suggests that directly routing a request from a web server to a transaction gateway is not intercepting." *Id.* (quoting Ex. C1 at 22).  The prosecution history does not contain a "clear and unmistakable disavowal" of "intercepting."  *See Purdue Pharma L.P. v. Endo Pharm. Holdings Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) ("[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution."); *see also Univ. of Pittsburgh of Commonwealth Sys. of High Educ. v. Hedrick*, --- F.3d ----, 2009 WL 2183175, at *5 (July 23, 2009) (same).   Defendants' prosecution history argument should accordingly be rejected.

Nonetheless, the Court must resolve the meaning of "intercepting" (*see O2 Micro*, 521 F.3d 1351), so the Court considers Plaintiff's proposed construction and Defendants' proposed "ordinary meaning."  On one hand, Defendants' proposal is rooted in inventor and expert testimony, rather than the claims or the specification, and is accordingly disfavored, as discussed below.  On the other hand, Plaintiff essentially offers no construction of the term "intercepting." The Court attempts to discern a meaning of "intercepting" based on its earlier claim construction

---

[9]  The Court reached this conclusion before the Federal Circuit decided *O2 Micro*.  521 F.3d 1351.

and the intrinsic and extrinsic evidence now identified by the Court and the parties.

> The specification discloses:
>
> Instead of Web server executable 201(E) processing the URL request, however, Interceptor 400 *intercepts* the request and routes it to Dispatcher 402.
> * * *
> Dispatcher 402 receives the *intercepted* request and then dispatches the request to one of a number of Page servers 404 (1)-(n).
> * * *
> In processing block 502, the Web server receives the URL request, and an interceptor then *intercepts* the handling of the request in processing block 504. The interceptor connects to a dispatcher and sends the URL request to the dispatcher in processing block 506.
> * * *
> In processing block 518, the dispatcher responds to the interceptor with the document name, and the *interceptor then replaces the requested URL with the newly generated HTML document* in processing block 520. The Web server then sends the new HTML document to the requesting client in processing block 522.

'554 Patent at 4:58-60, 5:38-40, 8:29-34, and 8:43-49 (emphasis added). These passages provide no explicit definition for "intercepting," but the usage of this term is evidently in the sense of interrupting something on its way from one place or state to another. *See also* Oxford English Dictionary (Second Edition 1989) (intercept, v.). Thus, the request is sent from some source, such as a Web client, to the Web server ('554 Patent at 4:54-60), but before the Web server processes the request (or at least before the Web server would have finished processing the request), the request is interrupted and sent to a page server. *Id.*; *id.* at 5:38-40.

Defendants' proposed "ordinary meaning" is not supported by the intrinsic evidence. Defendants propose, in part, "[e]xamining a request by reading the associated configuration data (e.g., the Multipurpose Internet Mail Extensions (MIME) type or URL path prefix)" (Dkt. No. 191 at 23), but the specification does not mention "configuration data," "reading" a request, or "MIME." Such words might themselves require construction. As to "determin[ing], based on

26

such examination[,] how the request should be handled," the specification does disclose that "Web client 200 issues a URL request that is processed to determine[] proper routing." '554 Patent at 4:55-56.

Defendants also rely on disclosure in the Leaf reference to support its proposed "ordinary meaning." Dkt. No. 191 at 26-27. Prior art can be relevant to claim construction, and "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1375 (Fed. Cir. 2006) ("When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning.") (citations and quotations omitted). Leaf discloses that "[w]hen a Web Browser 10, 12, 14, or 16 selects the service, the request is routed to the Web Server 18, which in turn routes the request to the Transaction Gateway Client." Dkt. No. 186, Ex. D1 at 4:55-57 (emphasis added). The "transaction gateway client," in turn, can provide access to a database by way of a transaction processing system. *Id.* at 2:17-24 and 4:50-52. But Leaf does not use the words "intercept" or "intercepting," and the portions of Leaf relied upon by Defendants describe a particular embodiment and should not limit the term "intercepting" as used in the patents-in-suit. *See* Dkt. No. 191 at 26-27 (citing Dkt. No. 186, Ex. D1 at 9:42-65).

Further, Defendants' extrinsic evidence is "less significant than the intrinsic record" discussed above. *Phillips*, 415 F.3d at 1317 (quotation and citation omitted).[10] Even the

---

[10] *See also Markman*, 52 F.3d at 982 (finding that "the testimony of [inventor] and his patent attorney on the proper construction of the claims is entitled to no deference"); *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346-47, n.5 (Fed. Cir. 2008) (noting that although inventor testimony "may be pertinent

testimony relied upon by Defendants does not show that the term "intercepting" necessarily includes all of the language that Defendants propose. Dkt. No. 191 at 23-24. This testimony appears to concern particular embodiments, rather than claim language, and most of these statements do not address "intercepting." *Id.* Although one statement addresses an "intercepting step" that includes "decid[ing] whether it's going to process this request locally or whether it's going to send the request onto the Apache servers," this evidently addresses an embodiment rather than claim language. *Id.* at 24.

The Court has also considered statements by Plaintiff in the Oracle Action and at the August 13, 2009 claim construction hearing in this case. *See* Dkt. No. 209 at 3-4 and Exs. C15, C20, and C21; Dkt. No. 191, Ex. C7. In the Oracle Action, Plaintiff's expert, Dr. Finkel opined that a particular reference, the "Oracle WebServer 2.0 Technical Note," "describe[s] 'intercepting' as it would have been known by one of ordinary skill in the art." Dkt. No. 209, Ex. C15 at ¶ 150. Plaintiff also argued in the Oracle Action that "the 'intercepting' functionality is simply one that *determines* that a page server rather than the Web server will process the request." *Id.*, Ex. C20 at 12-13. None of the statements identified by Defendants is sufficiently clear to justify finding that the term "intercepting," as used in the claims, must be interpreted according to Defendants' full proposed "ordinary meaning." In addition, Defendants have not shown that judicial estoppel or any similar doctrine should constrain Plaintiff's position in this

---

as a form of expert testimony, for example, as to understanding the established meaning of particular terms in the relevant art," "inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction).

case.[11]  Nonetheless, Plaintiff acknowledged at the August 13, 2009 claim construction hearing in

this case that there is an examination of a request to determine whether it should be intercepted

or not.  Plaintiff's statements in the Oracle Action and in this case indicate that the term

"intercepting" should be construed to include some "examining" and "determining."

The Court therefore construes the term "**intercepting**" to mean "**examining said request,**

**determining whether handling of said request should be interrupted or diverted, and if so,**

**interrupting or diverting the handling of said request accordingly.**"  Because the Court is

able to construe "intercepting," the Court rejects Defendants' proposal that this term is indefinite.

**10.**    "Page Server"

This term appears in Claims 1 and 11 of the '554 Patent and Claims 1, 2, 15, and 16 of

the '335 Patent.  Plaintiff proposes this term means "page-generating software or a machine

having page-generating software that generates a dynamic Web page."  Dkt. No. 181, Ex. A at 5

and 9.  Defendants propose this term means "[p]age generating application software, separate

from the Web server and separate from the operating system, that communicates directly with a

data source to generate a dynamic Web page."  Dkt. No. 191 at 31.[12]

---

[11]  *Cf. Lava Trading, Inc. v. Sonic Trading Management, LLC*, 445 F.3d 1348, 1353 (Fed. Cir. 2006) (in claim construction context, nothing that "[t]he doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed."); *Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281, 1290 (Fed. Cir. 2000) ("judicial estoppel 'prevent[s] a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process.'") (quoting *Yniguez v. Arizona*, 939 F.2d 727, 738 (9th Cir. 1991)).

[12]  In their pre-hearing statement, Defendants proposed that "page server" means "[p]age generating application software, separate from the Web server and separate from the operating system, that generates a dynamic Web page."  *Id.*, Ex. B at 10.

a.  The Parties' Positions

Plaintiff argues that "[t]he claim language is indifferent as to what *form* the page server takes.  The claims refer only to what the page server *does*."  Dkt. No. 186 at 8.  Plaintiff submits that "[t]he parties agree that . . . a 'page server' 'generates a dynamic Web page.'"  *Id.*

Defendants respond that the page server must be a "separate software module" because requests can be off-loaded onto them.  Dkt. No. 191 at 32.  Defendants argue that the partitioned architecture recognized by the Court in earlier claim construction means "there can be no overlap between the Web server and page server" because "otherwise the routing and releasing steps would be rendered meaningless."  *Id.*  Defendants argue that their proposal is "consistent with the partitioned architecture embraced by the patents . . . ."  *Id.* at 33.  Defendants also argue that "[p]age servers are also directly connected to data sources otherwise they would not be able to generate dynamic Web pages from data . . . dynamically retrieved from those data sources."  *Id.* at 32.

Plaintiff replies that the Court found in *epicRealm* that a "page server" may include operating software and is not necessarily an application software module.  Dkt. No. 201 at 16-17 (citing Dkt. No. 186, Ex. C3 at 3, 5, and 7).  Plaintiff also argues that Defendants' proposed "separate from" language is itself unclear.  *Id.* at 17.  Plaintiff further argues that the Court's earlier claim construction only found that the Web server and page server must not *both* be on the same machine *and* share the entirety of an operating system.  *Id.*

b.  Discussion

First, the Court's earlier claim construction noted that there cannot be "overlap at the operating system level between the web server and the page server" because otherwise "the Web

30

server would effectively be 'routing' requests from itself to itself." 8/7/2008 Order, Dkt. No. 186, Ex. C3 at 6 and 7 n.3. The page server must therefore be separate from the Web server. Plaintiff persuasively submits, however, that the "routing" would be effective where *either* the Web server and page server are on different machines *or* the Web server and page server do not entirely share an operating system. That is, the specification does not rule out that a Web server running on a first machine could route a request to a page server running on a second machine, even if that second machine is operated by the same operating system that is operating the first machine. In such a circumstance, although a common operating system operates both machines, the first machine is sufficiently distinct from the second machine for one to route a request to the other.

Second, the Court rejects Defendants' proposal that page servers must be directly connected to data sources. Defendants rely upon language in the specification indicating that a page server may be selected because it "has access to the requisite data in data source 408." Dkt. No. 191 at 32 (citing '554 Patent at 5:60-57). This disclosure of access, however, does not necessarily teach direct communication. Here, as discussed above, a proper construction of "page server" should not exclude situations where data is cached, as disclosed in the specification. '554 Patent at 6:66-7:8. Further, the specification discloses that "[i]n one embodiment, each Page server 404(1)-(n) resides on a separate machine on the *network* to distribute the processing of the request," and several claim preambles refer to a "networked system." *Id.* at 5:49-51 (emphasis added) and Claims 9-11. Because neither the claims nor the specification specify any particular type of network, a person of ordinary skill would understand

that direct communication is not necessarily required.[13]

The Court therefore construes the term "**page server**" to mean "**page-generating software (or a machine having page-generating software) that: (1) is separate from the machine of the Web server or separate from the operating system of the Web server; and (2) generates a dynamic Web page.**"

    11.    <u>"Releasing"</u>[14]

This term appears in Claims 1 and 11 of the '554 Patent and Claims 1 and 15 of the '335 Patent.  Plaintiff proposes this term means "freeing the web server to process new or pre-existing requests, by, at least, freeing processing resources of the web server."  Dkt. No. 181, Ex. A at 5-6 and 9.  Defendants propose: "[t]his claim term is indefinite. Alternatively, this term should be construed as: After the request is received by a page server, said page server performing an act (separate from merely receiving or processing the request) to free the Web server to process other requests."  *Id.*, Ex. B at 12.

    <u>a.  The Parties' Positions</u>

Plaintiff argues that this term is not indefinite because it has been construed before.  Dkt. No. 186 at 20.  Plaintiff also argues that the Court should adopt most of one of its earlier constructions of "releasing" in *epicRealm*.  *Id.*  Plaintiff further argues that the "separate from merely receiving or processing the request" language proposed by Defendants (and used by this

---

    [13]  For example, a person of ordinary skill in the art would recognize that network communication could be packetized, as communication on the World Wide Web usually is.

    [14]  The Court has also considered, as to the terms "intercepting" and "releasing," briefing on Defendants' Motion and Letter Brief for Permission to File Motion for Summary Judgment of Invalidity on Indefiniteness of All Claims of the '554 and '355 Patents, as well as Plaintiff's response and Defendants reply, as noted above with regard to "intercepting."  Dkt. Nos. 190, 195, and 204, respectively.

Court in *epicRealm*) "is not required by the claims or the specifications" and "complicated both the parties' and the jury's efforts to analyze infringement" in the *epicRealm* litigation. *Id.* at 21. Plaintiff submits that "the specification describes the freeing of the Web server as a natural consequence of the routing of the request to a dispatcher on a different machine (the Web server 'is thus free'), not as a result of a separate act on the part of the page server." *Id.* at 22 (discussing '554 Patent at 5:12-16).

Defendants respond that differing interpretations of "releasing" in the *epicRealm* litigation and the Oracle Action indicate that this term is indefinite. Dkt. No. 191 at 34 and 35. As for the "separate from merely receiving or processing the request" language in their proposed alternative construction, Defendants cite this Court's claim construction in *epicRealm* and discuss prosecution history in which, Defendants argue, "the patentee clearly defined releasing to be something other than processing" by stating: "At no time does Rogers teach or suggest 'concurrently' processing other requests or 'releasing said Web server to process other requests' because merely retrieving data from multiple sources does not teach or suggest these elements." *Id.* at 36-37 (citing Ex. C1 at 29 and quoting Response to Office Action, Ex. D4 at 15 of 17).

Plaintiff replies that Defendants' proposed construction introduces an "unnecessary and inappropriate . . . temporal limitation." Dkt. No. 201 at 5. Plaintiff also argues that the prosecution history relied upon by Defendants only shows that "data retrieval from multiple sources, standing alone, is not releasing," whereas "'processing[]' can encompass much more than data retrieval from multiple sources . . . ." *Id.* at 6. Thus, Plaintiff argues, the prosecution history does not require that releasing must be an act other than processing. *Id.* Plaintiff also submits that the United States Patent and Trademark Office rejected adding language similar to

"separate from merely receiving or processing the request" due to lack of support in the specification.  *Id.*

b.  Discussion

"If the meaning of the claim is discernible, even though the task may be formidable and *the conclusion may be one over which reasonable persons will disagree*, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds."  *Halliburton*, 514 F.3d at 1249 (quoting *Exxon Research & Eng'g Co. v. U.S.*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (emphasis added)).  The Court accordingly rejects Defendants' argument that differences in interpretation justify holding that the term "releasing" is indefinite.

The Court previously found that "releasing" includes freeing processing resources of the Web server as well as freeing the Web server to process new or pre-existing requests.  Dkt. No. 186, Ex. C3 at 10.  As to Defendants' proposed language "[a]fter the request is received by a page server," the Court found in *epicRealm* that "'releasing' may not be performed prior to the receiving of the request."  Dkt. No. 186, Ex. C3 at 13.  Plaintiff has not shown that the Court should hold otherwise in this case.

Also, the Court previously addressed the prosecution history cited by Defendants and found that it "does not mandate that releasing cannot implicitly occur due to routing from a web server to a page server."  Dkt. No. 186, Ex. C1 at 28.  The Court also found, however, that "as required by the claim language itself[,] the Page server takes some action to releas[e] the Web server," but "[t]he specification does not necessarily limit the claims to a particular technique by the Page server as to how the claimed release by the Page server is accomplished."  *Id.* at 29. The Court here construes the term "releasing" in a manner consistent with these previous

34

findings, which Defendants have not persuaded the Court to abandon.

The Court therefore construes the term "**releasing**" to mean "**after receiving the request or concurrent with receiving the request, said page server performing an act (separate from merely receiving or processing the request) to free the Web server to process new or pre-existing requests, by, at least, freeing processing resources of the web server.**"  Because the Court is able to construe "releasing," the Court rejects Defendants' proposal that this term is indefinite.

12.    "Request(s)" and "Other Requests"

a.  "Request(s)"

The term "request(s)" appears in Claims 1 and 11 of the '554 Patent and Claim 2 of the '335 Patent.  Since briefing, the parties have agreed that this term means "**a message that asks for a Web page**."  *See* Local Patent Rule 4-5(d) Claim Construction Chart, noticed at Dkt. No. 219, at 2.

b.  "Other Requests"

The term "other requests" appears in Claims 1 and 11 of the '554 Patent and Claims 1 and 15 of the '335 Patent.  Plaintiff proposed this term means "different requests."  Dkt. No. 181, Ex. A at 4 and 9.  Defendants proposed this term means "[d]ifferent new and pre-existing messages that ask for a Web page."  *Id.*, Ex. B at 10.  At the claim construction hearing, the parties agreed with a preliminary construction provided by the Court, as follows: "**different requests, which may be new or pre-existing**."  The Court therefore adopts this construction.

**13.**     "Routing"

This term appears in Claims 1 and 11 of the '554 Patent and Claims 1 and 2 of the '335

Patent.  Plaintiff proposes this term means "sending or forwarding data along a path toward a

destination."  Dkt. No. 181, Ex. A at 7 and 10.  Defendants propose that "routing" is used in two

senses.  Dkt. No. 191 at 38.  As to the first sense, Defendants propose: "This claim term is

indefinite.  Alternatively, as used in the first sense (discussed below), this term should be

construed as: sending from one component or machine along a path to one of at least two other

components or machines."  *Id.*  As to the second sense (discussed below), Defendants' propose

that "routing" should be construed to mean "sending from one component or machine along a

path to another component or machine."  *Id.*

a.  The Parties' Positions

Plaintiff argues that "'routing' necessarily concerns not just the fact of a conveyance, but

also the path—that is, the route."  Dkt. No. 186 at 19.  Plaintiff also argues that Defendants'

proposed construction should be rejected because Claim 1 of the '554 Patent refers to "routing

. . . to a dispatcher" but "nothing in the patents requires that multiple dispatchers exist."  *Id.*

Defendants respond that the term "routing" is used in two different "senses," the first of

which is indefinite and the second of which means "sending from one component or machine

along a path to another component or machine."  Dkt. No. 191 at 38.  Defendants propose that

the first sense is a "routing step" that "expressly includes three sub-steps: intercepting, routing,

and dispatching."  *Id.* (citing '554 Patent at Claims 1 and 11, and '335 Patent at Claims 1 and 2).

Defendants propose that because "intercepting" is indefinite, "routing" is also indefinite where it

includes "intercepting."  *Id.*  Defendants also argue that in this first sense, "the target has to

include two or more machines or components (page servers)." *Id.* at 39. Defendants propose that "[t]he *second sense* in which the term 'routing' is used involves sending 'said request from said Web server to a dispatcher.'" *Id.* at 39 (citing '554 Patent at Claims 1 and 11, and '335 Patent at Claim 2).

Plaintiff replies that Defendants' proposal that "routing" requires two constructions is "illogical" because: "the action component of [D]efendants' two constructions for routing are the same: 'sending . . . along a path'"; and "[t]he parties agree to this portion of the 'routing' construction." Dkt. No. 201 at 7. Plaintiff also argues that Defendants propose "unsupported limitations" that are already recited in the claims where appropriate. *Id.* at 8.

At the claim construction hearing, the Court provided its preliminary construction of "routing" to mean "sending from one component or machine along a path to another component or machine, wherein components may be software or hardware." Plaintiff was agreeable to this construction, and Defendants were agreeable as to the second "sense," in which "routing" is used, but not as to the first "sense."

b.  Discussion

First, nothing in the claims or the specification requires that there must be at least two components or machines to which a request can be routed. Instead, the "Scalability" portion of the specification, for example, teaches that "[a]ny number of Page servers can . . . be 'plugged' into the configuration illustrated in FIG. 4, and the Page servers will be instantly activated as the information is dynamically updated in Dispatcher 402." '554 Patent at 8:13-17. This use of "any number of Page servers" indicates that there may be only one page server in some embodiments. *Id.* Such embodiments would be consistent with "enjoy[ing] the advantage" of "off-loading the

processing of Web requests from the Web server machine." *Id.* at 5:27-28.

Second, the claims articulate "routing" and a "routing step," and the "routing step" may

include "intercepting," "*routing*," and "dispatching," as in Claim 1 of the '554 Patent:

> 1.  A computer-implemented method for managing a dynamic Web page
> generation request to a Web server, said computer-implemented method
> comprising the steps of:
>      *routing said request from said Web server to a page server*, said page
> server receiving said request and releasing said Web server to process other
> requests, *wherein said routing step further includes* the steps of *intercepting* said
> request at said Web server, *routing* said request from said Web server to a
> dispatcher, and *dispatching* said request to said page server; . . . .

'554 Patent at 8:66-9:5 (emphasis added).  Claim 1 of the '554 Patent thus recites "*routing* said

request from said Web server *to a page server*," followed by a description of "said *routing* step"

that itself includes "*routing* said request from said Web server *to a dispatcher*."  This use of

"routing" within an apparent definition of "routing" may invite confusion, but the discussion of

"said routing step" refers not to "routing" in the abstract but rather to the entire phrase of

"routing said request from said Web server to a page server."  As Plaintiff argued during the

claim construction hearing, a suitable analogy is that walking from a Point A to a Point C can

include walking to an intermediate Point B.  The Court therefore rejects Defendants' arguments

that the term "routing" must be construed in two distinct "senses."  The claim as a whole

indicates that "routing," as a general term, is a form of sending.

"Routing" and forms thereof also appear in the specification, such as follows:

> Depending on the URL specified by the Web client 200, the request may be
> *routed* by either Web server executable 201(E) to Web page 201 (1), for example,
> or from Web server executable 202(E) to Web page 202 (1).
> * * *
> In processing block 300, the Web client makes a URL request.  This URL request
> is examined by the Web browser to determine the appropriate Web server to *route*

the request to in processing block 302.

* * *

FIG. 4 illustrates one embodiment of the presently claimed invention. Web client 200 issues a URL request that is processed to determined proper *routing*. In this embodiment, the request is *routed* to Web server 201.

* * *

By *routing* the request to Dispatcher 402 residing on a different machine than the Web server executable 201(E), the request can then be processed by a different processor than the Web server executable 201(E).

'554 Patent at 4:3-6, 4:12-15, 4:56-60, and 5:12-16 (emphasis added); *see also* '554 Patent at 5:60-6:19. These passages of the specification confirm that "routing" is a form of sending.

Plaintiff proposes that "routing" includes "the path—that is, the route," and the parties both submit that the construction of the term "routing" should include the words "along a path." Dkt. No. 186 at 19; Dkt. No. 191 at 38. The claims and specification discussed above indicate that "routing" is not simply broadcasting, but the Court notes that the claims and specification are silent on whether any intermediate components also participate in directing a request along a path to its destination. Thus, in adopting the parties' proposed "along a path" language, the Court declines to find that a device or component that performs "routing" must know or establish the *entire* "path."

The Court construes the term "**routing**" to mean "**sending from one component or machine along a path to another component or machine, wherein components may be software or hardware.**" Because the Court is able to construe "routing," the Court rejects Defendants' proposal that this term is indefinite.

39

14.     "Transferring"

This term appears in Claims 15 and 16 of the '335 Patent.  Plaintiff proposes this term

means "sending."  Dkt. No. 181, Ex. A at 10.  Defendants propose this term should be

"[c]onstrued the same as 'routing.'" Dkt. No. 191 at 29.[15]

a.  The Parties' Positions

Plaintiff cites earlier constructions of "transferring" and argues that the specification uses

"transferring" synonymously with "sending."  Dkt. No. 186 at 18 (citing Ex. C1 at 26 and '335

Patent at 8:38-39).  Plaintiff submits that "[t]he claims already specify the applicable senders

when they use the term."  *Id.* at 18.

Defendants respond that "transferring" appears only in Claims 15, 16, and 29 of the '335

Patent and appears nowhere in the specification.  Dkt. No. 191 at 30.  Defendants argue that

"[o]ther claims have the same structure as these claims, but use 'routing' instead of

'transferring.'"  *Id.*  Defendants also argue that "[d]uring prosecution of the '335 [P]atent, both

the USPTO and the applicant treated the terms 'transferring' and 'routing' interchangeably."  *Id.*

Plaintiff replies that "[c]laim terms that are different are presumed to have different

meaning."  Dkt. No. 201 at 8.  Plaintiff argues that "routing" is different from "transferring"

because "'routing' implies not only the act of sending, but also the *route* taken."  *Id.*

b.  Discussion

The Court has construed "routing" above to mean "sending from one component or

machine along a path to another component or machine, wherein components may be software or

_____

[15]  In their pre-hearing statement, Defendants proposed as to "transferring" that "[t]his claim term is
indefinite.  Alternatively, this term should be construed as: Sending from one component or machine along a path to
one of at least two other components or machines."  Dkt. No. 181, Ex. B at 14.

hardware." In light of the absence of the word "transferring" or "transfer" in the specification, the Court finds no adequate justification for construing "transferring" in a manner different than "routing." The Court accordingly construes the term "**transferring**" to mean **"sending from one component or machine along a path to another component or machine, wherein components may be software or hardware."** Because the Court is able to construe "transferring," the Court rejects Defendants' proposal that this term is indefinite.

      **15.**    <u>"Web Page" and "Page"</u>

      <u>a.  "Web Page"</u>

The term "Web page" appears in Claims 1 and 11 of the '554 Patent and Claim 1 of the '335 Patent. Plaintiff proposes this term means "web content displayable through a Web browser." Dkt. No. 181, Ex. A at 7 and 10. Defendants propose this term means "[a] document transmitted over the Internet and displayed by a Web browser." *Id.*, Ex. B at 15.

Plaintiff argues that the Court should construe "Web page" consistent with earlier claim construction orders. Dkt. No. 186 at 25. Plaintiff also argues that Defendants' proposal should be rejected as unsupported because "[n]othing in the claim language suggests any limitation based on *where* the Web page gets transmitted to, or *how* the Web page gets displayed, or that it be displayed *at all*." *Id.*

Defendants respond that "Defendants' proffered construction . . . requires a Web page to be an actual page, where[as] Plaintiff asks for the page itself to be defined as the content on the page." Dkt. No. 191 at 40. Defendants argue that "[t]he term 'Web page' is used throughout the entire specification in the sense of a document . . . ." *Id.* at 41. Defendants also propose that the specification teaches that "a Web page is located on the World Wide Web, [which] is only

accessed via Internet, [so] it follows that a Web page must be transmitted over the Internet." *Id.*

at 42. Defendants argue that a page may reside on an intranet using HTTP but that such a page

would be an "'intranet' page" rather than a "'Web' page." *Id.* Defendants also cite the

specification for purported support that "a Web page is not merely displayable, but is in fact

displayed by a Web browser." *Id.* (citing '554 Patent at 8:47-51 and Fig. 5 at ref. num. 524).

Plaintiff replies that "to describe a page as 'a document' does not capture the range of

content that is transmittable over the Internet (or an intranet)," such as "graphics, pictures,

sounds, and videos." Dkt. No. 201 at 15. Plaintiff also argues that once a Web page resides on

the Web, "[a] Web page that has not yet been transmitted and viewed is a Web page

nonetheless." *Id.* at 16.

First, Defendants have not shown that a Web page must actually be transmitted over the

Internet in order to be a Web page. Instead, "[o]nce created, Web pages reside on the Web, on

Web servers or Web sites." '554 Patent at 1:22-23. Second, the specification teaches:

> Web pages are documents that contain hyperlinks: The World Wide Web (the
> Web) represents all of the computers on the Internet that offer users access to
> information on the Internet via interactive documents or Web pages. Web pages
> contain hypertext links that are used to connect any combination of graphics,
> audio, video and text, in a non-linear, non-sequential manner.

*Id.* at 1:14-19. In addition to the statement that "Web pages are documents," the use of "or" in

the reference to "interactive documents *or* Web pages" appears to mean something akin to "*i.e.*"

or "that is."[16] A person of ordinary skill in the art reading the claims in the context of the entire

specification would understand the term "Web page" to refer to a "document." Also, the

---

[16] For example, the specification refers to "CFI 'calls' or procedures" and "'new' or dynamic data." *Id.* at
1:49-50 and 1:53.

statement in the above-quoted passage that "Web pages contain hypertext links that are used to connect any combination of graphics, audio, video and text" indicates that a Web page *contains* content but is not *itself* content.

Although the Court construed "Web page" in *epicRealm* to mean "Web content displayable through a Web browser," the parties addressed whether a "Web page" is a "document" or "content" but focused heavily on other issues. *See* Dkt. No. 186, Ex. C1 at 6-9. In particular, the parties primarily focused on whether a "Web page" must be in Hypertext Markup Language ("HTML") and must be available by way of a Uniform Resource Locator ("URL"). *See* Civil Action No. 5:07-CV-125 at Dkt. Nos. 162 at 22-24, 165 at 7-10, 176 at 28-31, 185 at 3-5, and 189 at 3-4; *see also* 7/13/2006 Markman Hr'g Tr., Civil Action No. 5:07-cv-125, Dkt. No. 190 at 10-15 and 21-24.

On balance, based on the above discussion, the specification better supports construing "Web page" as a type of "document," as Defendants propose, rather than as "web content," as Plaintiff proposes. The Court therefore construes the term "**Web page**" to mean "**a document displayable by a Web browser.**"

b. "Page"

The term "page" appears in Claim 15 of the '335 Patent. Plaintiff proposes this term means "content." Dkt. No. 181, Ex. A at 9. Defendants propose that this term should be "[c]onstrued the same as 'Web page.'" Dkt. No. 191 at 29.

Plaintiff argues that Claim 15 of the '335 Patent "covers embodiments of the invention without regard to whether the embodiment is web based" because that claim refers generically to "an HTTP-compliant device" rather than to a "Web server." Dkt. No. 186 at 25-26. Plaintiff

thus argues that the "page" recited in Claim 15 need not be a "Web page." *Id.* at 26. Defendants respond that the term "page" is used synonymously with "Web page." Dkt. No. 191 at 29 (citing *Nystrom*, 424 F.3d at 1142-43). Defendants also submit that the specification does not use the term "page" independent of the term "Web page," as noted in claim construction in *epicRealm*. *Id.* at 29 (citing Ex. C1 at 10). Plaintiff replies that even Defendants acknowledge that a "page" need not be a "Web page" because Defendants submit that "documents on an intranet are not Web pages." Dkt. No. 201 at 15.

Claim 15 of the '335 Patent recites:

15.   A computer-implemented method comprising the steps of:
transferring a request from an HTTP-compliant device to a page server, said page server receiving said request and releasing said HTTP-compliant device to process other requests wherein said transferring step further includes the steps of:
intercepting said request at said HTTP-compliant device and transferring said request to said page server;
processing said request, said processing being performed by said page server while said HTTP-compliant device concurrently processes said other requests; and
dynamically generating a *page* in response to said request, said *page* including data dynamically retrieved from one or more data sources.

'335 Patent at 9:61-10:9 (emphasis added). The word "page" also appears independent of the word "Web" in the term "page server." The claims and the specification consistently refer to a "page server" where the "page" at issue is a "Web page." *See, e.g.,* '554 Patent at Claim 1 and 2:21-35; '335 Patent at Claim 1. Also, in Claim 15 of the '335 Patent, where the term "page" appears, the "request" is transferred from "an HTTP-compliant device." '335 Patent at 9:63-64 and 10:8-10. "HTTP," in turn, is "a special software language" that the specification teaches is used to create "[h]ypertext links," which "Web pages contain." '335 Patent at 1:17-22. The

patentee thus consistently used the term "page" to refer to a "Web page." In reaching this conclusion, the Court need not resolve whether a document on an intranet can be a "Web page." *See Nystrom*, 424 F.3d at 1143-46.

The Court construes the term "**page**" to mean "**a document displayable by a Web browser.**"

**16.**    "Web Server"

This term appears in Claims 1 and 11 of the '554 Patent and Claims 1 and 2 of the '335 Patent. Plaintiff proposes this term means "software, or a machine having software, that receives Web page requests and returns Web pages in response to the requests." Dkt. No. 181, Ex. A at 7 and 10. Defendants propose this term means "[s]oftware, or a machine having software, that receives Web page requests, generates and returns Web pages in response to certain such requests." *Id.*, Ex. B at 15.

a.  The Parties' Positions

Plaintiff cites construction of "Web server" in *epicRealm* and argues that "the patents contemplate embodiments in which the Web server *does not* generate pages." Dkt. No. 186 at 6-7. Plaintiff also argues that Defendants' proposed language of "in response to *certain* requests" "fails to state which requests are, and are not, to be generated and returned by a Web server." *Id.* at 7-8.

Defendants respond that "[t]he Web server is not merely a pass-through router, switch, or load balancer." Dkt. No. 191 at 43. Defendants rely in part on "common, ordinary understanding" and argue that "the key function of a Web server [is] its ability to generate Web pages in response to requests received from users of the World Wide Web." *Id.* at 44.

45

Defendants also argue:

> The fact that a page server can generate a Web page does not preclude a Web server from also being able to generate a Web page. A Web Server generates Web pages (static or dynamic) in response to requests, and the page server generates Web pages in response to the dynamic requests which are dispatched to it by the Web server.

*Id.* Defendants further argue that a Web server only responds to "certain" requests because "the specification clearly provides that the Web server can send some requests to a page server and then can concurrently process other requests." *Id.* (citing '554 Patent at 6:20-32).

Plaintiff replies that Defendants' proposed construction is ambiguous as to what is generated and whether generation must be "in response to certain requests." Dkt. No. 201 at 19. Plaintiff argues that the specification only "indicate[s] that a Web server *may* generate Web pages," not that it *must*. *Id.* Plaintiff also argues that "Web servers serving up . . . static Web pages would not be generating them" and that "in the preferred embodiment described in the specification, all Web pages are generated by page servers." *Id.* at 20. As to the language "in response to certain such requests" proposed by Defendants, Plaintiff argues that concurrent *processing* of requests by a page server and a Web server does not support finding that a Web server only *returns* Web pages in response to certain requests. *Id.*

b. Discussion

Defendants' proposal focuses on particular situations or embodiments and should not be imported into the construction of "Web server." Regardless of whether a Web server may be capable of generating a Web page, the claims themselves recite, for example, "routing [a dynamic Web page generation] request from [a] Web server to a page server," which "process[es] said request" and "dynamically generat[es] a Web page in response to said request."

'554 Patent at Claim 1; *see also* '554 Patent at Claim 11 and '335 Patent at Claims 1 and 15. The claims thus contemplate that page servers, rather than Web servers, generate Web pages. Also, the specification emphasizes the "advantage" of "off-loading the processing of Web requests from the Web server machine." '554 Patent at 5:26-30. A person or ordinary skill in the art would thus understand that the patentee envisioned systems and methods in which the Web server does not generate Web pages, and the claims should be construed accordingly.

The Court therefore adopts its *epicRealm* construction and construes the term "**Web server**" to mean "**software, or a machine having software, that receives Web page requests and returns Web pages in response to the requests.**"

## V. CONCLUSION

The Court hereby **ORDERS** the disputed claim terms construed as set forth above.

**IT IS SO ORDERED.**

**SIGNED this 24th day of August, 2009.**

DAVID FOLSOM
UNITED STATES DISTRICT JUDGE